**James SOLOMON; Dara Solomon; Terry Miller; and Hilary Miller, Plaintiffs**

v.

**WAFFLE HOUSE, INC. Defendant**

**No. 1:03–CV–2797–ODE.**

United States District Court, N.D. Georgia, Atlanta Division.

Nov. 4, 2004.

Alysa Beth-Ann Freeman, David C. Ates, Miller Billips & Ates, Atlanta, GA, Carolyn P. Weiss, Susan E. Huhta, Washington Lawyers' Committee for Civil Rights and Urban Affairs, Washington, DC, Corie D. Pauling, Henderson Hill, Ferguson Stein Chambers Atkins Gresham & Sumter, Charlotte, NC, Erin P. Drew, Mary E. Kohart, Meghan Cherner-Ranft, Patricia Proctor, Thomas J. Barton, Viktoriya Meyerov, Drinker Biddle & Reath, Philadelphia, PA, for Plaintiffs.

David E. Gevertz, Nancy E. Rafuse, R. Lawrence Ashe, Jr., Sandra Kim, Scott McKown Lenhart, William Bradley Hill, Jr., Ashe Rafuse & Hill, Atlanta, GA, for Defendant.

## ORDER

ORINDA D. EVANS, District Judge.

This race discrimination action pursuant to 42 U.S.C. § 1981 and § 2000a is presently before the Court on (1) Defendant's Motion for Summary Judgment [# 72] and (2) Defendant's Motion for Contempt [# 105].

### I. *Facts*

Unless otherwise indicated, the following facts are undisputed. Plaintiffs Hilary Miller, Terry Miller, Dara Solomon, and James Solomon (collectively, "Plaintiffs") are neighbors and personal friends. Sabrina VanderStappen and Aaron VanderStappen also reside in the same neighborhood and are personal friends of Plaintiffs. Hilary and Terry Miller are Caucasian. Aaron and Sabrina VanderStappen are also Caucasian. Dara and James Solomon are African–American.

### A. *Plaintiffs' April 21, 2002 Visit to the Alpharetta Waffle House*

On Saturday, April 20, 2002, Plaintiffs, the Millers' ten-year-old daughter (Jessi-

ca), and the VanderStappens (collectively, "Plaintiffs' party") attended a wedding held in Vinings, Georgia. On their way home from the wedding, Terry Miller suggested that they stop at the Waffle House located on Arnold Mill Road in Alpharetta, Georgia ("Alpharetta Waffle House"). Plaintiffs' party arrived at the Alpharetta Waffle House around midnight. They entered the restaurant together, turned to the left, and immediately seated themselves at two adjacent booths in the back of the restaurant. Hilary Miller, Jessica Miller, Dara Solomon, and James Solomon sat together in one of the booths ("the Solomon table") while Terry Miller and the VanderStappens sat together in the other booth ("VanderStappen table").

Plaintiffs' party observed three employees were currently working at the restaurant: a white male server (Jerry Wall), a white female server (Petra Corbitt), and a white cook (Melvin Nichelson). Jerry Wall ("Wall") was assigned to a three-booth area, including the Solomon and VanderStappen booths. Petra Corbitt ("Corbitt") appeared to be taking care of all the other tables in the restaurant. Although Plaintiffs' party cannot remember how many customers were already seated in the Alpharetta Waffle House when they arrived, Hilary Miller estimated that there were under ten customers (H. Miller Dep. at 108), and Aaron VanderStappen also estimated that there were eight to ten customers (A. VanderStappen Dep. at 64).

After both tables were seated, they talked amongst themselves for approximately 20 minutes about the wedding. During this time, Wall did not approach either table. Noticing that they did not have menus on their table, the Vander-Stappen table requested menus from Wall.

Wall brought menus to the VanderStappen table and took their drink orders. At that time, Terry Miller informed Wall that the VanderStappen and Solomon tables were together and that Hilary and Jessica Millers' orders should be added to his check. Wall did not say anything in response.

After taking drink orders from the VanderStappen table, Wall walked towards the Solomon table. James Solomon asked Wall if he could bring menus for the Solomon table. Wall, however, continued walking past the table and did not stop. James Solomon does not know if Wall heard his request. According to Dara Solomon, no one at their table was able to make eye contact with Wall as he walked past the Solomon table.

Wall returned after a few minutes [1] with drinks for the VanderStappen table and served them the correct drinks. Wall then took the VanderStappen table's food orders and walked away without saying anything. During this second visit to the their table, the VanderStappens both formed the opinion that Wall was slow and may have been mentally disabled. A. VanderStappen Dep. at 58–60; S. VanderStappen Dep. at 57–59. They based their opinions on the fact that Wall was "stumbling around," seemed "confused," and had "no idea what he was doing," and on his complete lack of verbal responses during their interactions with him. A. VanderStappen Dep. at 58–60; S. VanderStappen Dep. at 77.

After taking the VanderStappen table's food order, Wall again walked by the Solomon table without stopping. The Vander-Stappen table then gave their menus to the Solomon table, and the Solomon table

---

1. Testimony on the amount of time that lapsed is conflicting. While James Solomon testified only five minutes passed before Wall returned with the drinks (J. Solomon Dep. at 76), Sabrina VanderStappen described the wait as "longer than would normally be expected (S. VanderStappen Dep. at 80–81)".

began looking at the menus to determine what they wanted to order.

After approximately twenty minutes, Wall delivered the VanderStappen table's food orders to their table. Terry Miller was completely satisfied with his order, and ate all his food. Sabrina VanderStappen, however, was not satisfied with her order: her eggs were cold, her waffle was burned, and she did not receive her bacon. Wall never brought Sabrina VanderStappen her bacon, even though she let him know that she did not receive it. Aaron VanderStappen did not order any food. Wall then appeared at the Solomon table and the Solomon table gave him their orders for drinks and meals. Wall then walked away.

After some time passed and the Solomon table had not received their drinks, Terry Miller got up and asked Corbitt for the manager on duty. Corbitt told him that Melvin Nichelson ("Nichelson"), the cook, was in charge. Terry Miller then approached Nichelson, who was busy cooking with his back to the counter, and told him that the Solomon table had not received service. In response, Nichelson looked over at Wall and then turned back to the grill.

Wall then returned to the Solomon table and stated something to the effect of "what did you order?" J. Solomon Dep. at 89–90. The entire table was required to give him their food and drink orders again. The entire Solomon table, including James and Dara Solomon, then promptly received their drinks. After the Solomon table requested straws, Wall immediately placed a bunch of straws on the table.

While the Solomon table was waiting for their food, they observed that a party of four white patrons sitting at the third booth in Wall's section had already received some food. They arrived approximately 30 minutes after Plaintiffs' party had arrived. Plaintiffs do not know what this party ordered or whether they were satisfied with the food and service they received.

Hilary Miller and Jessica Miller subsequently received their food. According to Hilary Miller, her food was burned, and Jessica's food was "not fit to eat." H. Miller Dep. at 122. Dara and James Solomon did not receive their food when Hilary and Jessica Millers' orders were served.

Terry Miller then got up a second time, walked back up to the grill and told Nichelson that there was a problem with Wall and that the Solomons had not been served. Nichelson simply gave Terry Miller a blank look. After Dara Solomon suggested that the Solomons could get their food "to go" because everyone else had almost finished eating, Terry Miller stated something to the effect of "I don't think you're getting your food" and "you guys aren't getting—you're not going to get any service." Wall then brought both tables their bills and gave each family a ticket, including the Solomons, even though they had not received their food. Only the VanderStappens paid for their meals.

Both tables then decided to leave the restaurant. On their way out, Dara Solomon and Terry Miller approached the grill to complain to Nichelson. Dara Solomon told Nichelson that Defendant "couldn't treat people like this" (D. Solomon Dep. at 188), and Terry Miller told Nichelson that "blatant discrimination" had gone on (T. Miller Dep. at 144). Both Dara Solomon and Terry Miller raised their voices in anger during this conversation with Nichelson. Other than a blank stare, Nichelson gave no response. Overhearing Terry Miller's statement to Nichelson regarding discrimination, Wall said something to Terry Miller to the effect of "we can take this outside" or "let's step out." Terry Miller claimed he felt threatened.

As James Solomon walked out of the restaurant, he noticed that a party of four, comprised of three Caucasians and one African–American, had seated themselves at the third table in Wall's section. James Solomon does not know if they received satisfactory service from Wall. J. Solomon Dep. at 121. During the time that Plaintiffs were in the Waffle House, the restaurant became increasingly crowded. At the time Plaintiffs left, there were approximately 25–30 customers in the restaurant.

### B. Plaintiffs' Complaint to Waffle House

After the Solomons, Millers, and VanderStappens arrived home, everyone congregated at the Miller's house to discuss their visit to the Alpharetta Waffle House. During this conversation, Dara Solomon stated that she wanted to make a formal complaint to Waffle House. Later in the day, the Solomons, Millers, and VanderStappens got together and prepared a written statement describing their visit. On the next day, April 22, 2002, Dara Solomon called the Alpharetta Waffle House and spoke to the unit manager, Carlos Figueredo ("Figueredo"). Although she did not specifically use the term "discrimination" when articulating her complaint to him, Dara Solomon mentioned "the race mix of the party." D. Solomon Dep. at 223. Figueredo apologized to Dara Solomon and suggested that she call the corporate office to make a formal complaint. Based on this short interaction, Dara Solomon believed that Figueredo was very helpful, professional, and that he was appropriately concerned about her experience at the Alpharetta Waffle House.

"Greg," a Waffle House employee whom Dara Solomon contacted through a friend of a friend, directed Dara Solomon to call "Tina" and issue a formal complaint. Dara Solomon called Tina, and at her request, faxed Tina the party's written statement of the incident.

### C. Waffle House's Response to Plaintiffs' Complaint

On April 24, 2002, Waffle House wrote to Dara Solomon to: (1) acknowledge receipt of her discrimination complaint; (2) explain that the Company took discrimination allegations "very seriously;" (3) request she complete the enclosed Customer Comment Questionnaire; (4) inform her that Audrey Tassinari is the Case Manager assigned to their matter; and (5) assure her that a thorough investigation would begin immediately. The Millers and VanderStappens also received letters with the Questionnaire attached. The Millers, VanderStappens and Solomons met and jointly prepared answers to the Questionnaire and sent it back to Waffle House.

Case Manager Audrey Tassinari conducted Waffle House's investigation into Dara Solomon's complaints. Tassinari traveled to the Alpharetta Waffle House and interviewed Jerry Wall, Petra Corbitt, Melvin Nichelson, and Carlos Figueredo. She also interviewed Chris Bostic, the Unit Manager of Wall's home store, District Manager Mike Carter, and Waffle House associates who had worked with Wall in the past. Based on her investigation, Tassinari concluded that Wall was slow mentally, became confused easily, and was overwhelmed when Plaintiffs' party of seven entered the restaurant and filled two of his booths. Although Plaintiffs' party received very poor service, there was no evidence of race discrimination. Wall and Nichelson were issued written reprimands for unprofessional behavior as a result of the investigation. Waffle House sent letters to the Solomons, the Millers, and the VanderStappens on June 13, 2002 informing them of the results of the investigation

and enclosing a $20.00 gift certificate for each family.

### D. *Jerry Wall*

The record shows that in 1969 or 1970, while serving as a police officer, Wall "got knocked in the head with a bat [that] put a blood clot behind [his] eye." Wall Dep. at 145. Wall recovered after two days in the hospital and continued to work as a police officer for a year and a half following the incident. While working as a carpet cleaner from 1976 and 1982, Wall suffered a stroke that left him hospitalized for about two weeks. Wall Dep. at 23–25. Wall returned to work in about a month and feels he has fully recovered since. Wall Dep. at 24, 126. Blaming old age, Wall testified that he does not remember things like he used to but indicated that his memory problems only started in the year 2003. While the atmosphere at Waffle House made him "confused constantly," specifically because customers demanded refills and changed orders, Wall nonetheless testified that he never had any trouble keeping track of people's changing orders or asking for refills. Wall Dep. at 56. In January 2004, Wall was diagnosed with manic depression by a psychiatrist. Wall Dep. at 141, 168.

Physically, Wall suffers from arthritis in his knee, which causes pain when he walks more than a mile. Wall Dep. at 144. However, Wall testified that he is not aware of any problems from standing long periods of time. *Id.*

Though he believes Wall is capable of properly servicing three tables, Christopher Bostic, the unit manager at Wall's assigned Waffle House (unit 862), perceived Wall as physically slow but could not say that he was mentally slow. Bostic Dep. at 63. District Manager Mike Carter agreed that Wall was slow in his service and added that Wall was also mentally slow:

Jerry seems to me that he has a difficulty—I don't know how to say it without sounding—he seems slow, to me—slow in understanding, slow in processing information, as if—I don't know how to say it, without sounding rude, but as if he's not all there.

Carter Dep. at 90. Based on his experience, Carter observed that Wall did not do well "multi-tasking" or in "high stress situations," but would become "overwhelmed" and "lose it." *Id.* at 85–89. Accordingly, Wall was given only a three-booth section.

On occasion, Wall was "loaned out" to other area Waffle Houses that needed extra help on a given night. On several occasions, Wall was "loaned out" to the Alpharetta Waffle House. Chris Figueredo, the unit manager of the Alpharetta Waffle House, worked with Wall on several occasions and perceived him as being mentally slow: "Jerry Wall, you know, he forgets things, you know, he forgets a lot of things." Figueredo Dep. at 188.

Carter testified that he received complaints regarding Wall's service. Specifically, he received complaints about "forgetfulness," "not having utensils to eat with," "items being ... wrongly delivered." Carter Dep. at 180. In a ten-month period, Carter received two to three complaints regarding timeliness, and in two of those three Wall had forgotten silverware or drinks. Carter Dep. at 117, 180–81. Despite these complaints, no one ever issued Wall a written reprimand for his failure to serve a customer promptly or disciplined him in any way. Carter Dep. at 90, 92; Bostic Dep. at 70. Wall also testified that he received no reprimands concerning his service of customers, nor did anyone ever speak to him about a need to be a faster server. Wall Dep. at 30.

Wall testified that he was fired by Waffle House as a result of Plaintiffs' com-

plaint of discriminatory treatment. Wall Dep. at 17–18.

## II. *Defendant's Evidentiary Objections*

Defendant asks this Court to exclude the following in passing on Defendant' motion for summary judgment: (1) hearsay testimony by Hilary Miller and Dara Solomon; (2) Declarations of Hilary Miller and Dara Solomon; and (3) deposition testimony of Donald Wright.

### A. *Hearsay Testimony by Hilary Miller and Dara Solomon*

Defendant objects to the following hearsay statements:

1.) Hilary Miller's deposition testimony that her daughter, Jessica Miller, told her that her food "wasn't good." H. Miller Dep. at 122 (hereinafter referred to as "Declarant Statement 1").

2.) Dara Solomon's deposition testimony that she heard James Solomon say the Solomons were not going to receive service. D. Solomon Dep. at 183 (hereinafter referred to as "Declarant Statement 2").

Defendant argues that because Plaintiffs have not demonstrated that these statements will be reduced to admissible form at trial,[2] this Court should not consider the statements.

■ Plaintiffs argue that Declarant Statement 1 is admissible under the present sense impression hearsay exception under Federal Rules of Evidence Rule 803(1). Under this exception, a statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter" is admissible for the truth of the matter asserted. Here, upon beginning to eat her meal, and upon tast-

ing her food, Jessica Miller complained to her mother that the meal was not good. This Court, therefore, agrees that Declarant Statement 1 falls within the present sense impression hearsay exception.

■ With respect to Declarant Statement 2, this Court agrees with Plaintiff that this statement is admissible non-hearsay. The statement is not offered to prove that the Solomons would never get service at the Alpharetta Waffle House. A statement that is inadmissible hearsay to prove the truth of the matter asserted may nonetheless be admitted to show the statement's effect on the hearer, Dara Solomon. Alternatively, statements by a declarant that serve as circumstantial evidence of the declarant's state of mind are not hearsay. Such statements are not offered to prove the truth of the matter asserted but only that the declarant, here James Solomon, believed them to be true.

This Court, therefore, will not exclude Declarant Statements 1 and 2 in passing on Defendant's Motion for Summary Judgment.

### B. *Declarations of Hilary Miller and Dara Solomon*

■ Defendant argues that because Hilary Miller and Dara Solomon's Declarations contradict their respective deposition testimonies, this Court should exclude their Declarations. According to Defendant, both Hilary Miller and Terry Miller unambiguously stated in their depositions that they had no plans to return to a Waffle House restaurant, and later, in an effort to establish standing for injunctive relief, stated in their respective Declarations that they would, in fact, return to a Waffle House restaurant if Defendant takes measures to prevent discriminatory

---

**2.** Jessica Miller will not offer her testimony at trial. Likewise, James Solomon's alleged statement is unsupported by his own testimo-

ny, which identified Terry Miller as the only individual who made such a comment.

practices. Indeed, when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, prior testimony. *See Van T. Junkins and Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir.1984).

After reviewing the deposition testimonies of Hilary Miller and Dara Solomon, however, this Court agrees with Plaintiffs that the deposition testimonies and corresponding Declarations are not contradictory. Hilary Miller testified in her deposition that she had no plans to go to a Waffle House because of the incident in question. H. Miller Dep. at 73. Similarly, Dara Solomon testified in her deposition that she "currently" had no plans to return to a Waffle House because of the hurtful discriminatory service she received. D. Solomon Dep. at 59. In this Court's opinion, these deposition testimonies do not amount to unambiguous statements that neither Hilary Miller nor Dara Solomon ever plan to return to a Waffle House. Instead, consistent with their Declarations, Hilary Miller and Dara Solomon's deposition testimonies suggest that both would return to a Waffle House when the restaurant remedies their discriminatory practices.

This Court, therefore, will not exclude Hilary Miller and Dara Solomon's Declarations.

### C. *Deposition of Donald Wright*

■ Plaintiffs offer the deposition testimony of former Waffle House manager Donald Wright ("Wright") in support of their allegation that Waffle House engages in a pattern and practice of discrimination. Based on Wright's testimony, according to Plaintiffs, Waffle House has been alerted to discrimination in Waffle House restaurants in the Atlanta metro area in the past and has failed to take action. Defendant argues that Wright's testimony is temporally and geographically remote from the events in this case, and as such, the prejudicial effect of the testimony far outweighs its relevance.

While Defendant's argument may have merit if the testimony were being offered at trial, this Court will not exclude Wright's deposition in passing on Defendant's Motion for Summary Judgment.

### III. *Summary Judgment Standard*

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the [Defendant] is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56. In ruling on Defendant's motion, the Court must view the evidence in light most favorable to Plaintiffs. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). To prevail in its motion for summary judgment, Defendant must show that the evidence is insufficient to establish an essential element of Plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If Defendant makes a sufficient showing, then Plaintiff "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the evidence supporting Plaintiff's claims is insufficient for a jury to return a verdict for Plaintiff, or is "merely colorable" or "not significantly probative," then Defendant is entitled to summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If, however, reasonable minds could differ as to the import of the evidence, and a reasonable interpreta-

tion of the evidence could lead to a verdict for Plaintiff, then summary judgment is inappropriate. *Id.* at 251–52, 106 S.Ct. 2505.

## IV. *Section 1981*

### A. *Liability*

Although it is now clear that non-minorities may avail themselves of § 1981,[3] this section only protects certain enumerated rights. Section 1981 provides:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence and to full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

To state a claim under § 1981, therefore, a plaintiff must prove a deprivation of one of the enumerated rights which, under similar circumstances, would have been accorded to a person of a different race and also that such deprivation was intentional and motivated by racial prejudice. Thus, a section 1981 claim requires a showing of (1) a failure to perform a contractual obligation (2) as a result of an intention to discriminate racially. *See General Bldg. Contractors Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (Section 1981 "can be violated only by purposeful discrimination").

The parties agree that there is no direct evidence of discrimination in this case. In evaluating motions for summary judgment regarding discrimination claims where a plaintiff has no direct evidence of discrimination, courts generally use the burden-shifting scheme set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The parties have stipulated in their briefs, and the Court agrees, that the *McDonnell Douglas* analysis, adopted for Title VII discrimination cases, is applicable in public accommodation cases. *Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); *Brown v. Am. Honda Motor Co.,* 939 F.2d 946, 949 (11th Cir.1991). Under this analytic scheme, a plaintiff must first establish a prima facie case of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Once a plaintiff establishes a prima facie case, which thereby permits an inference of discrimination, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse action and must produce some evidence in support of that reason. *Id.; Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the defendant is able to meet this burden of production, the plaintiff, to survive summary judgment, must then present sufficient evidence to demonstrate that the proffered reason is merely a pretext for

---

3. *See, e.g., McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 296, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) ("the District Court erred in dismissing petitioners' claims under § 1981 on the ground that the protections of the provision are unavailable to white persons").

discrimination. *Burdine,* 450 U.S. at 253–54, 101 S.Ct. 1089.

### 1. *Prima Facie Case*

Extrapolating the pertinent elements of the *McDonnell Douglas* analysis to a Section 1981 contract claim, plaintiff must demonstrate the following elements to establish a prima facie case of race discrimination: (1) that she is a member of a protected class; (2) that the allegedly discriminatory conduct concerned one or more of the activities enumerated in the statute, i.e., the making, performance, modification, or termination of contracts, or the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship; and (3) that the defendant treated the plaintiff less favorably with regard to the allegedly discriminatory act than the defendant treated other similarly situated persons who were outside plaintiffs' protected class. *Benton v. Cousins Properties, Inc.,* 230 F.Supp.2d 1351 (N.D.Ga.2002), *aff'd,* 97 Fed.Appx. 904 (11th Cir.2004). Stated another way, the third prong requires plaintiff to show an apt comparator of a different race who was not subjected to the same harsh treatment with regard to the enforcement of a contract as was the plaintiff.

In their Motion for Summary Judgment, Defendant argues that Plaintiffs cannot prove the second and third elements of their prima facie case because they cannot show that they were denied service or that similarly-situated non-African American patrons received more favorable treatment. The Court examines each Plaintiff in turn.

### a. *Terry Miller*

■ Terry Miller has not stated a claim under § 1981. He claims only that he was threatened physically because (a) he was dining with the Solomons and (b) he complained to the Waffle House manager regarding Jerry Wall's discriminatory treatment toward the Solomons. Pla.'s Ex. 18.

He does not allege a violation of any of the rights that are listed in § 1981, i.e., that Defendant interfered with his contract rights because of his association with the Solomons. Instead, Mr. Miller admits he was completely satisfied with the food and service he received from Wall, testifying that the quality of his food "was fine" and he "didn't have an issue with the service at [his] table." T. Miller Dep. at 129, 140. Although Mr. Miller may have experienced discrimination, his own rights under the section have not been impinged.

Plaintiffs claim Terry Miller is protected under § 1981 from adverse action based on his association and the retaliatory action taken against him for speaking out against the unlawful discrimination. The Court rejects this argument. The cases relied upon by the Plaintiffs are easily distinguishable from the present situation: Terry Miller's inability to enjoy the company of his friends in Defendant's restaurant is unlike the interference with a white plaintiff's contract rights because of his association with a black person. For example, in *Jackson v. Motel 6,* 130 F.3d 999 (11th Cir.1997), when motel employees were placed in a hostile work environment as a result of their refusal to discriminate against minority patrons, they stated a claim under § 1981 because the defendant interfered with their contract rights (i.e., employment), not their rights of association. Also, in *Pinkard v. Pullman–Standard, Div. Of Pullman, Inc.,* 678 F.2d 1211 (5th Cir.1982), when plaintiffs were discharged for opposing the discriminatory practices of defendant, they stated a claim for relief under § 1981 not because of the illegal discrimination against black persons but because their own contract rights had been impinged.

Neither can Mr. Miller state a claim under § 1981 based on third-party standing. "[O]rdinarily, one may not claim

standing ... to vindicate the constitutional rights of some third party." *Barrows v. Jackson,* 346 U.S. 249, 255, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). Although courts have expanded the bounds of standing under § 1981 to allow "the only effective adversary" to sue, the presence of black plaintiffs in this case belies any contention that a white plaintiff would be "the only effective adversary."

Because Terry Miller cannot satisfy the second prong of his prima facie case, this Court GRANTS Defendant's Motion for Summary Judgment with respect to Terry Miller's § 1981 claim.

### b. *Hilary Miller*

 Defendant argues that Hilary Miller's prima facie case must fail because she was not denied service and/or the full benefit and enjoyment of a place of accommodation. According to Plaintiffs, however, Hilary Miller personally suffered exceedingly poor and discriminatory service as a result of being seated at the same table as James and Dara Solomon. Therefore, she states a claim under § 1981 because her own contract rights with Waffle House have been impinged as a result of her association with the Solomons.

A claim for interference with the right to make and enforce a contract must allege the actual loss of a contractual interest. It is undisputed that Wall took Hilary Miller's drink and meal order and served her all the items requested. Although Hilary Miller complains that her "hashbrowns were burnt to a crisp and were not fit to eat," this Court declines to hold that a customer's subjective opinion that food served was not edible amounts to a violation of rights enumerated under § 1981, especially where Defendant did not have the opportunity to appease the customer. H. Miller Dep. at 235. Neither does the delay in service rise to the level of violating one's civil rights. To be sure, courts have properly commented upon the fact that all persons have unpleasant experiences in restaurants and other places of public accommodation. *See, e.g., Bobbitt v. Rage, Inc.,* 19 F.Supp.2d 512, 519 (W.D.N.C.1998) ("While [rude and/or bad service] is regrettable and frustrating, it is a phenomenon familiar to all who eat at restaurants"); *Robertson v. Burger King, Inc.,* 848 F.Supp. 78, 81 (E.D.La.1994) ("While inconvenient and frustrating, and all too common, the mere fact of slow service in a fast food restaurant does not, in the eyes of this Court, rise to the level of violating one's civil rights"). "Certainly, the trivialities and frustration of life in post-modern America must not be made the fodder for federal civil rights simply because service is slow or otherwise lacking ...." *Callwood v. Dave & Buster's, Inc.,* 98 F.Supp.2d 694, 706 (D.Md.2000).

Plaintiffs cite *McCaleb v. Pizza Hut of America, Inc.,* 28 F.Supp.2d 1043 (N.D.Ill. 1998) to support their assertion that slow or poor service is actionable under § 1981. The facts of *McCaleb,* however, are readily distinguishable. In *McCaleb,* defendant failed to provide plaintiffs with utensils with which to eat their meals. Also, defendant refused to make a contract with plaintiffs in that defendant refused to sell them drinks that they expressed an interest in purchasing. Additionally, defendant interfered with the full enjoyment of the contract by driving out plaintiffs before they had completed eating all that they had intended to eat. Unlike the *McCaleb* plaintiffs, Hilary Miller was denied neither admittance to the restaurant nor service, nor was she asked to leave at any time. Further, Hilary Miller was able to place her order and receive her dinner.

Like Terry Miller, neither can Hilary Miller claim a violation of her § 1981 rights based purely on association or on third-party standing.

Because there is no evidence that Hilary Miller was actually deprived of any of the rights enumerated in § 1981, Hilary Miller has failed to prove the second element of her prima facie case. There may be some level of bad service that would suffice to satisfy the second prong of the § 1981 prima facie case notwithstanding the successful completion of the sales contract. If such a level of service does exist, it has not been supported by any evidence in the instant case with respect to Hilary Miller. Accordingly, this Court GRANTS Defendant's Motion for Summary Judgment with respect to Hilary Millers § 1981 claim.

### c. Dara and James Solomon

Similarly, Defendant argues that Dara and James Solomon's prima facie case must fail because, like Terry and Hilary Miller, they, too, were provided service and/or the full benefit and enjoyment of a place of public accommodation. Wall initially approached the Solomons' table and asked, "What would you like to drink?" D. Solomon Dep. at 156. When the Solomons expressed a desire to place their food orders, Wall responded, "Okay." Id. at 159. When Wall next returned to their area, the Solomon table pointed out they had not received their drinks. Wall appeared confused and responded, "What did you have to drink again, what was your drink order again?" D. Solomon Dep. at 168. Wall then delivered the correct drink orders to the entire table within a "couple of minutes" and then promptly delivered straws to the table as requested. Id. at 176–77.

Clearly, the Solomons received some level of service. As both parties agree, however, the Solomons did not receive their meal orders before they left the restaurant. The question, therefore, is whether or not Defendant actually denied the Solomons food services in this encounter. Defendant argues that because Terry Miller asked for the parties' check, and since Terry Miller had informed Wall earlier that both booths were together, Plaintiffs terminated the contractual transaction before Wall had the opportunity to serve (or not serve) the Solomons. Therefore, according to Defendant, the Solomons have not shown that they were denied service.

Contrary to Defendant's argument, however, this Court will not require a § 1981 plaintiff to wait indefinitely for food service when a reasonable person can conclude that no service is forthcoming. Indeed, in light of the clear illegality of outright refusal to serve, a restaurant which wishes to discourage minority customers must resort to more subtle efforts to dissuade. Common dining experience indicates that food ordered together at a restaurant is served within close proximity of each other. When Wall served Hilary and Jessica Miller their food without serving the Solomons or indicating that their food was coming, it was reasonable for the Solomons to conclude that they would not be served, especially since the Vander-Stappen table had not only received their food but also consumed it by that time. Likewise, a reasonable jury could conclude that Wall had no intention of serving the Solomons—even before Wall delivered Plaintiffs' check.

Defendant cites two cases to support its assertion that a plaintiff cannot maintain a § 1981 violation when plaintiff was the party responsible for terminating the transaction, even if the plaintiff left the establishment because of what they perceived to be racial animus. Both cases, however, are not binding on this Court and are also readily distinguishable. In Mendez v. Pizza Hut of Am., Inc., No. 02–C–1819, 2002 WL 31236088 (N.D.Ill. Oct.3, 2002) and Bagley v. Ameritech Corp., 220 F.3d 518 (7th Cir.2000), plaintiffs in both cases expressly refused service from defendants. In this case, however, there is

no evidence that the Solomons refused service from Wall. In fact, there is no evidence that Wall offered to bring the Solomons their meals. This Court, therefore, finds that the Solomons have produced sufficient evidence to support the finding of fact that Defendant impinged on their contractual rights in violation of section 1981 by denying to sell them food they intended to purchase.

The next question, therefore, is whether the Solomons have produced sufficient evidence to satisfy the third prong of their prima facie case, i.e., whether Waffle House treated the Solomons less favorably with regard to the allegedly discriminatory act than other similarly situated persons.[4] Both parties cite *Lizardo v. Denny's, Inc.*, 270 F.3d 94 (2d Cir.2001) for the applicable standard of similarity in the restaurant context. According to *Lizardo*, when plaintiffs seek to draw inferences of discrimination by showing that they were similarly situated in all material respects to the individuals to whom they compare themselves, "their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances." *Id.* at 101. "What is key is that they be similar in significant respects." *Id.* In the non-employment context, the Northern District of Georgia has interpreted the third prong as requiring § 1981 plaintiffs to produce an "apt comparator." *Benton*, 230 F.Supp.2d at 1370.

It is this Court's opinion that the Solomons have produced sufficient evidence from which a trier of fact could conclude that similarly situated white patrons were treated more favorably than the Solomons. The most obvious "apt comparator" in this case is the VanderStappen table. Indeed, Defendant admits that Plaintiffs' own party "were arguably similarly situated to the Solomons." Def.'s Br. at 13. The record shows that the VanderStappen table and the Solomon table both sat down at the same time in adjacent booths served by Jerry Wall. Wall, however, took drink and food orders only from the VanderStappen table and delivered the requested drink and food items to the VanderStappen table before even acknowledging the Solomons. Wall eventually took the Solomons' food and drink order, but delivered only their drinks. By the time the entire VanderStappen table consumed their meal, the Solomons still had not received their food orders. Both tables then decided to leave before the Solomons received any food.

Defendant argues that the VanderStappen table was not treated more favorably than the Solomons because the VanderStappen table received varying levels of service from Wall. For example, the VanderStappens complained that Wall was slow to serve them their drinks. Furthermore, Sabrina VanderStappen was dissatisfied with her meal: her eggs were cold, her waffle was burnt, and she did not

---

4. Plaintiffs urge this Court to adopt the Sixth Circuit's articulation of the third prong of the prima facie test in *Christian v. Wal–Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir.2001) and only require Plaintiffs to show that Plaintiffs received services in a "markedly hostile manner" and in a manner which a reasonable person would find objectively discriminatory.

The Northern District of Georgia, however, has declined to adopt the *Christian* prima facie test because "[t]he test requires a finding of the ultimate issue—discrimination— and its operative phrase, 'markedly hostile manner,' is so vague as to be unhelpful in the context of a business conflict." *Benton*, 230 F.Supp.2d at 1378. Although *Benton* involved a contract regarding the rental of a conference room from a hotel, this Court finds that *Benton*'s rationale for declining to adopt *Christian*'s less-restrictive test for a prima facie case also applies in the restaurant context. Furthermore, without guidance from the Eleventh Circuit or the U.S. Supreme Court, this Court declines to expand the traditional prima facie test for race discrimination.

receive her bacon. In effect, Defendant argues that because Wall's service was unsatisfactory all around, the Solomons cannot show they have received discriminatory treatment. This Court disagrees. Though it is regrettable that Sabrina VanderStappen never received her bacon, no reasonable person can disagree that receiving some food service constitutes more favorable treatment than receiving no food service at all. Furthermore, it is undisputed that Terry Miller was completely satisfied with his food and drinks and Wall's service. Defendant does not argue that Terry Miller, a similarly situated person, was treated more favorable than the Solomons.

Therefore, this Court finds that the Solomons have established a prima facie case of race discrimination.

### 2. Defendant's Legitimate, Nondiscriminatory Reason

■ Once a plaintiff establishes a prima facie case, which thereby permits an inference of discrimination, the burden falls on the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse action and must produce some evidence in support of that reason. *Id.;* see *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). It is important to bear in mind, however, that the defendant's burden of rebuttal is "exceedingly light." *Batey v. Stone*, 24 F.3d 1330, 1334 (11th Cir.1994). The defendant need not persuade the court that it was actually motivated by the proffered reasons. Instead, "it is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254–55, 101 S.Ct. 1089. The explanation provided must be legally sufficient to justify a judgment for the defendant. *Id.* At this stage of the inquiry, the defendant need not

persuade the court that its proffered reasons are legitimate; the defendant's burden is "merely one of production, not proof." *Lee v. Russell County Bd. Of Educ.*, 684 F.2d 769, 773 (11th Cir.1982).

Defendant argues that the poor service some members of Plaintiffs' party received from Wall on April 21, 2002 resulted from Wall's mental and physical impairments and his related inability to handle Plaintiffs' party of seven. Defendant has articulated a legitimate nondiscriminatory reason for its failure to serve the Solomons and has pointed to evidence in the record which supports that reason. Chris Bostic, the unit manager at Wall's assigned unit, Carlos Figueredo, the unit manager at the Alpharetta Waffle House, and Mike Carter, Wall's District Manager, all perceived Wall as physically "slow" and/or mentally "slow." Accordingly, Wall's managers limited Wall to a three-booth serving section.

### 3. Plaintiffs' Showing of Pretext

■ The burden of going forward, therefore, returns to Plaintiffs. A plaintiff may satisfy this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). "[A] plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decisions are not believable." *Howard v. B.P. Oil Co.*, 32 F.3d 520, 526 (11th Cir.1994). Although the presumption of discrimination drops out once the defendant meets its burden of production, the plaintiff need not always introduce additional, independent evidence of discrimination to survive sum-

mary judgment. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

The case is now at the *Burdine* juncture where "the factual inquiry proceeds to a new level of specificity." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997), *cert. denied*, 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). Although Defendant is entitled to summary judgment in its favor if the Solomons do not proffer sufficient evidence of pretext, the converse is not necessarily true. If the Solomons do proffer sufficient evidence that the Defendant's stated reasons are pretextual, the Solomons still may not be entitled to take this case to the jury. *Chapman v. AI Transport*, 229 F.3d 1012, 1025 (11th Cir.2000); *see also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("[A] reason cannot be proved to be a 'pretext *for discrimination'* unless it is shown *both* that the reason was false *and* that discrimination was the real reason."). (emphasis in original). In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), which dealt with Federal Rules of Civil Procedure Rule 50, judgment as a matter of law,[5] the Supreme Court stated:

> [A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employers unlawfully discriminated.
>
> That is not to say that such a showing will always be adequate to sustain a jury finding of liability. Certainly there will always be instances where, although the plaintiff has established a prima facie

case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.

*Reeves*, 530 U.S. at 148, 120 S.Ct. 2097; *see also Walker v. NationsBank N.A.*, 53 F.3d 1548, 1557–58 (11th Cir.1995) (accepting plaintiff's contention that defendant's proffered reasons were lies, and nonetheless affirming directed verdict for defendant); *Batey v. Stone*, 24 F.3d 1330, 1334 n. 12 (11th Cir.1994) (noting that after *Hicks*, focus in discrimination cases is no longer falsity of employer's explanation, but whether plaintiff has proved intentional discrimination).

Disbelief of defendant's proffered explanation, however, is not irrelevant. In *Hicks*, the Supreme Court specifically stated:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.

*Hicks*, 509 U.S. at 511, 113 S.Ct. 2742. In short, proving the defendant's reason false—though not always sufficient to show pretext—becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination.

Plaintiffs argue that the record supports a finding of pretext. First, Plaintiffs point to the lack of any expert testimony stating that Wall suffers from any form of mental defect. Second, Wall himself testified that

---

**5.** Although the *Reeves* case involved a judgment as a matter of law, and not a summary judgment, the standard for granting summary judgment mirrors the standard for judgment

as a matter of law, such that the inquiry under each is the same. *Reeves*, 530 U.S. at 150, 120 S.Ct. 2097 (quotations and citations omitted).

he had no trouble serving his customers, despite his physical limitations. Plaintiffs also point to Wall's job history, which includes working as a police officer and as a supervisor in a carpet cleaning business. During his three years of employment at Waffle House, Wall received no discipline for slow or otherwise unsatisfactory service. Waffle House even asked Wall to train new employees. Third, Christopher Bostic, the Waffle House manager who worked the most with Wall, testified that Wall was only physically slow, not mentally slow. Furthermore, all of Waffle House's witnesses testified that Wall generally had no trouble serving the three tables he was assigned to serve.

In deciding whether the Solomons have met their ultimate burden of establishing a genuine issue of material fact whether Wall's actions were racially motivated, the Court has considered all of the evidence, including the previously produced evidence establishing the prima facie case. It is this Court's opinion that Defendant's proffered explanation of the events allows some room for disbelief. Specifically, Defendant's alleged nondiscriminatory reason for Wall's conduct—that Wall was physically and/or mentally incapable of providing adequate service—does little to explain why the VanderStappen table received satisfactory service. Also, it is undisputed that a party of white patrons sitting in the third booth in Wall's section received food while the Solomon table continued to wait, even though the white patrons arrived after the Solomons. A jury may have reason, therefore, to disbelieve that Wall was actually overwhelmed by the size of Plaintiffs' party. Also, a jury may find Wall's alleged mental incapacity unbelievable given (1) the absence of any medical diagnosis and (2) only Defendant's own managers make this characterization of Wall. It is this Court's opinion, therefore, that these ground for disbelieving Defendant, combined with the strength of the Solomons'

prima facie case, would permit the trier of fact to infer the ultimate fact of intentional discrimination.

### 4. *Waffle House's Liability for Wall's Actions*

■ Waffle House argues that it may not be liable for Wall's refusal to serve Plaintiffs because his actions were either (1) limited to him personally and not committed in furtherance of the employment; or (2) outside the scope of his employment. Citing *LaRoche v. Denny's Inc.,* 62 F.Supp.2d 1366, 1373 (S.D.Fla.1999), Defendant contends that if a reasonable person would "believe that the agent is violating the orders of the principal or that the principal would not wish the agent to act under the circumstances known to the agent, he cannot subject the principle to liability."

*LaRoche,* however, may not be reliable precedent on this point. Indeed, in *Arguello v. Conoco, Inc.,* 207 F.3d 803 (5th Cir. 2000), the Fifth Circuit reversed the district court decision upon which the *LaRoche* court relied and held that managerial involvement is not necessary for liability to attach in a discrimination action. Specifically, the *Arguello* court held that

> in a public accommodation case under § 1981, a rule that only action by supervisors are imputed to the employer would result, in most cases, in a no liability rule. Unlike the employment context it is rare in a public accommodation settings [sic] a consumer will be mistreated by a manager or supervisor. Most consumer encounters are between consumers and clerks who are non-supervisory employees .... For all these reasons we are persuaded that the restrictive rules of respondeat superior ... do not apply to this case.

*Arguello,* 207 F.3d at 810. The court added that an employer might be held vicariously liable even for racial epithets unex-

pectedly uttered by its non-supervisory employees under general agency principles where the remarks are made in the normal course of business and while the particular employee is conducting "normal duties." *Id.*

The Eleventh Circuit, however, has not adopted this less restrictive law of respondeat superior. This Court, therefore, turns to the common law of agency in determining Waffle House's liability for Wall's conduct. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Pursuant to Section 219(1) of the Restatement (Second) of Agency, an employer will always be held liable for the torts of its employees committed while acting in the scope of their employment. If the employee acts outside the scope of their employment, however, the employer may still be held liable if one of the following four conditions is met: (a) the employer intended the conduct or the consequence; (b) the employer was negligent or reckless; ©) the conduct violated a non-delegable duty of the employer; or (d) the employee purported to act or speak on behalf of the employer and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency. Restatement (Second) of Agency § 219(2).

Defendant argues that Wall's actions, as alleged by Plaintiffs, violated Waffle House's non-discrimination policies and procedures, and, therefore, Wall acted outside the scope of his employment. Plaintiffs, however, cite the absence of any evidence in the record that this non-discrimination policy was provided to the employees at the Alpharetta Waffle House. Specifically, Corbitt, a server at the Alpharetta Waffle House, testified that her name had been forged on a "Talk to Me, Listen to Me" document which addressed non-discrimination policies. Corbitt Dep. at 135.

Indeed, a reasonable jury could conclude that Wall was acting within the scope of his employment. In *Middlebrooks v. Hillcrest Foods, Inc.,* 256 F.3d 1241 (11th Cir. 2001), the Eleventh Circuit held that a reasonable jury could conclude that an employee acted within the scope of his employment given that the employee was cooking when he turned and used offensive language. In this case, Wall was admittedly working as a server on the night in question and was charged by his employer with direct customer dealings. Unlike cases cited by Defendant, therefore, Wall's acts were neither purely personal nor without any benefit to Waffle House.

Even if Wall acted outside the scope of his employment, there is sufficient evidence in the record for a reasonable jury to conclude that Waffle House ratified Wall's conduct. Nichelson, the manager on duty that night, did nothing to prevent or correct Wall's conduct. Indeed, Nichelson's failure to sanction Wall's improper behavior could be interpreted by the jury as acquiescence by the employer in the behavior. Though Waffle House counters that both Wall and Nichelson were disciplined, it is undisputed that the discipline did not address their allegedly discriminatory conduct.

This Court, therefore, declines to grant Defendant summary judgment on grounds that Waffle House cannot be held vicariously liable for Wall's actions.

## B. *Remedies*

### 1. *Punitive Damages*

■ Defendant also asks this Court to grant summary judgment on Plaintiffs' punitive damages claims, arguing that Plaintiffs, as a matter of law, cannot prove that Waffle House's conduct was motivated by evil motive or intent, or that it involved reckless or callous indifference to the Plaintiffs' federally protected rights. In-

deed, as the Eleventh Circuit stated in *Splunge v. Shoney's, Inc.*, 97 F.3d 488, 491 (11th Cir.1996), punitive damages under § 1981 are available only where the complaining party demonstrates that the defendant (1) engaged in discriminatory practices with malice or (2) with reckless indifference to the federally protected rights of the aggrieved individual. Malice is defined as "an intent to harm" and recklessness means "serious disregard for the consequences of [one's] actions." *Id.*

In support of their claim for punitive damages, Plaintiffs point to Waffle House's "shockingly one-sided investigation," which Plaintiffs claim was designed to cover up discrimination. Pla.'s Br. at 23. Furthermore, Plaintiffs argue that Waffle House failed to take meaningful steps to prevent further discriminatory conduct by employees in the future. *Id.*

This Court finds that there is no evidence in the record to support an award for punitive damages. It is undisputed that once Waffle House received Plaintiffs' complaint, it promptly investigated their claim. Waffle House wrote to Dara Solomon to: (1) acknowledge receipt of her discrimination complaint; (2) explain that the Company took discrimination allegations "very seriously;" (3) request she complete the enclosed Customer Comment Questionnaire; (4) inform her that Audrey Tassinari is the Case Manager assigned to their matter; and (5) assure her that a thorough investigation would begin immediately. Audrey Tassinari interviewed (1) all Waffle House employees on duty on the night of the alleged incident, (2) the unit manager for the Alpharetta Waffle House and Wall's assigned unit, (3) the district manager, and (4) other employees who had worked with Wall in the past. Based on the investigation, Waffle House concluded that Wall was overwhelmed by the size of Plaintiffs' party. These actions by Waffle House effectively negate the possibility that a jury could find that Waffle House intended to harm Plaintiffs or acted with reckless indifference to Plaintiffs' federally protected rights. Plaintiffs have introduced no evidence to show that Waffle House's conclusion (i.e., that there was no evidence of discrimination) was made in bad faith.

Because there is no evidence in the record to support Plaintiffs' claims for punitive damages, Defendant's motion for summary judgment on Plaintiffs' punitive damages claim is GRANTED.

### 2. *Injunctive Relief*

■ Because Plaintiffs cannot show a "real or immediate threat that [they] will be wronged again," *City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), Defendant argues that Plaintiffs are not entitled to injunctive relief. Plaintiffs do not dispute this statement of law.

James Solomon testified that he would return to a Waffle House restaurant if significant changes were made to ensure that no future discrimination occurred. J. Solomon Dep. at 37–38. Dara Solomon asserted that she will never dine at another Waffle House again (D. Solomon Dep. at 59), but she later revised her deposition testimony in her Declaration, asserting that she would, in fact, visit a Waffle House restaurant again if Waffle House took steps to ensure that discrimination no longer occurs in its restaurants.

It is well-established that intent may be relevant to standing. In *Clements v. Fashing,* 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982), for example, the Supreme Court of the United States considered a challenge to a provision of the Texas Constitution requiring the immediate resignation of certain state officeholders upon their announcement of candidacy for another office. The Supreme Court concluded that the officeholders had stand-

ing because they had alleged that they would have announced their candidacy for other offices were it not for the automatic resignation provision they were challenging. *Id.* at 962, 102 S.Ct. 2836. Similarly, in *Northeastern Florida Chapter, Associated General Contractors of America v. Jacksonville,* 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993), the Supreme Court considered whether an association challenging an ordinance that gave preferential treatment to certain minority-owned businesses in the award of city contracts needed to show that one of its members would have received a contract absent the ordinance in order to show standing. The Supreme Court concluded that in the face of such a barrier, "to establish standing, a party ... need only demonstrate that it is able and ready to bid on contract and that a discriminatory policy prevents it from doing so on an equal basis." *Id.* at 666, 113 S.Ct. 2297.

In bringing their challenge against Waffle House, James and Dara Solomon stated that they would visit Waffle House if its allegedly discriminatory policies were remedied. As such, they have demonstrated that they are "able and ready" to dine at a Waffle House should the restaurant take significant steps to prevent discriminatory practices by its employees. James and Dara Solomon, therefore, have standing to seek prospective relief with respect to Waffle House's continued practices.

## V. *Section 2000a*

Plaintiffs' next claim is asserted under Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a for racial discrimination in the denial of a public accommodation. Section 2000a provides:

> All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segre-

gation on the ground of race, color, religion, or national origin.

■■■ The same burden-shifting analysis used in the employment context under *McDonnell Douglas* is also applied to claims under Title II. *Benton,* 230 F.Supp.2d 1351, 1382 (N.D.Ga.2002). In order to establish a claim under Title II, the plaintiff must show that she (1) is a member of a protected class; (2) attempted to contract for services and afford herself the full benefits and enjoyment of a public accommodation; (3) was denied the full benefit or enjoyment of a public accommodation; and (4) such services were available to similarly situated persons outside her protected class who received full benefits or who were treated better. *Id.,* citing *Laroche,* 62 F.Supp.2d at 1382.

■■■ The inquiry for a § 2000a claim, therefore, is essentially the same for a § 1981 claim. Both parties briefed the claims as such. For reasons discussed in Part IV.A.1, this Court grants summary judgment with respect to Plaintiffs Terry and Hilary Miller and denies summary judgment with respect to Plaintiffs James and Dara Solomon.

A plaintiff seeking to enforce the substantive provisions of § 2000a, however, can only obtain injunctive relief. *United States v. Johnson,* 390 U.S. 563, 88 S.Ct. 1231, 20 L.Ed.2d 132 (1968). Plaintiffs must therefore show a real or immediate threat that they will be wronged again—a likelihood of substantial and immediate irreparable injury. *Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999 (11th Cir. 1997) (applying standard to § 2000a–2 claim). As discussed in Part IV.B.2, both James and Dara Solomon have standing to seek injunctive relief. Therefore, summary judgment is DENIED with respect to James and Dara Solomon's § 2000a claims.

## VI. *Defendant's Motion for Contempt*

 Defendant asks this Court to hold Dara Solomon, Terry Miller, and Hilary Miller in contempt for their alleged failure to obey this Court's June 17, 2004 discovery ruling concerning the Defendant's motion to compel a response to Interrogatory 7, which asked Plaintiffs to state the amount by type of damages they seek in this action and the basis for calculating the same. Rejecting Plaintiffs' argument that there was no way to state a specific measure of non-economic compensatory damages, this Court ordered Plaintiffs to "do what [they] can" and to "[a]nswer [Interrogatory 7] to the best of [their] ability." After the ruling, Defendant sought Plaintiffs' response to Interrogatory 7 through numerous e-mail correspondences. Finally, Plaintiffs faxed the Millers' amended responses and the Solomons' amended responses on August 2, 2004 and August 4, 2004, respectively. In their amended response, Plaintiffs provided a narrative claiming that: (1) they "cannot even begin to quantify" their damages (Terry Miller); (2) it is "literally impossible" for them to do so (Hilary Miller); and (3) they "cannot articulate a number" of what damages they seek and will "leave it to the jury" (Dara Solomon).[6]

Having reviewed Plaintiffs' narratives, this Court accepts Plaintiffs' assertion that they have answered Interrogatory 7 to the best of their ability. Defendant's motion for contempt is DENIED. Evidence at trial regarding damages, however, will be limited to Plaintiffs' amended responses.

## VII. *Conclusion*

Defendant's Motion for Summary Judgment [# 72] is GRANTED in part and DENIED in part. Summary judgment is granted in favor of Defendant against

---

Plaintiffs Terry Miller and Hilary Miller as to all claims. Summary Judgment is denied with respect to Plaintiffs Dara Solomon and James Solomon's 42 U.S.C. § 1981 and § 2000a claims, but is GRANTED as to Plaintiffs claims for punitive damages. Finally, Defendant's Motion for Contempt [# 105] is DENIED.

The parties are ordered to confer and to file a proposed consolidated pretrial order within thirty (30) days.

---

6. Defendant does not seek a finding of contempt against James Solomon, whose amended response to Interrogatory 7 estimated his

damages at $1,000 per minute for about 200 minutes.