# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3910

_____

Crystal Gregory; Alberta Turner; Carla    *
Turner; Treva Gage; Debra Hamilton;    *
Capria Lee; Antwinette Avery; Jeff    *
McKinney; Arnel Monroe; Michael    *
Richmond; Maren Snell; Felicia Turner; *
Michael Warrick; LaShanda Wisham;    *
Cecilia Young,                           *   Appeal from the United States
                                          *   District Court for the Western
            Plaintiffs - Appellants,    *   District of Missouri.
                                          *
      v.                                   *
                                          *
Dillard's, Inc.,                        *
                                          *
           Defendant - Appellee.    *

_____

Submitted: June 14, 2006
Filed: July 20, 2007

_____

Before MURPHY, MELLOY, and COLLOTON, Circuit Judges.

_____

MURPHY, Circuit Judge.

Crystal Gregory and Alberta and Carla Turner initiated this action against Dillard's, Inc. under 42 U.S.C. § 1981 and the Missouri Human Rights Act (MHRA). They allege that racially discriminatory policies and practices at the Dillard's department store in Columbia, Missouri denied them the same ability to purchase merchandise and access services as enjoyed by others, in violation of their rights under federal and state law. Fourteen additional African American plaintiffs later

filed similar claims under § 1981. The amended complaint seeks declaratory, injunctive, and monetary relief. Dillard's moved for summary judgment and dismissal for failure to state a claim, and the district court ruled in its favor except as to the claim of Michael Butler which later settled. The dismissed plaintiffs appeal,[1] arguing that the district court erred in its analysis and application of the law. We affirm in part and reverse in part.

## I.

## A.

The original complaint was filed in April 2003 by Gregory and the Turners; it was amended one year later to add the other plaintiffs. The thirteen African American appellants are predominantly residents of Columbia or nearby communities, ranging in age from twenty to fifty seven at the time of the incidents about which they testified during discovery. The record in this case appears to be unique among the reported circuit cases dealing with § 1981 claims in the retail context in that it includes evidence not only from shoppers, but also from former Dillard's employees.

The jurisdictional statement in the amended complaint alleges that Dillard's denied plaintiffs "the privileges of making shopping purchases" and "deprived [them] of services enjoyed by non-minorities" as part of its "purposeful pattern and practice of racial discrimination with respect to African American customers." The complaint alleges further that the plaintiffs "sought to make and enforce a contract for services ordinarily provided by Dillard's" but they were denied the right to enter into a contract and were "deprived of services [available to] similarly situated persons outside the protected class," that Dillard's discriminated against them "by directly and/or indirectly refusing, withholding from or denying" them services, and that the store

---

[1]Antwinette Avery and Cecilia Young subsequently withdrew from the appeal, and Deidre Golphin voluntarily dismissed her claim.

"frequently engages in . . . discriminatory surveillance pursuant to a policy and practice of racial discrimination." Each of the plaintiffs dismissed under Rule 12(b)(6) was alleged to have "experienced, within the time period of 1998 to [the] present, instances at Dillard's Columbia, Missouri store in which they were followed and/or otherwise subject to surveillance based upon their race." Each individual claim incorporated all the other allegations in the complaint by reference.

In its answer Dillard's denied the allegations in the complaint and alleged a number of affirmative defenses: failure to state a claim for which relief could be granted, failure to exhaust administrative remedies, any unlawful conduct was outside the scope of employment, failure to mitigate damages, any emotional distress or mental injuries had other causes, and constitutional grounds prevent any punitive damages. Because of Dillard's successful motions for summary judgment and failure to state a claim, its other defenses were not developed before the district court.

During discovery plaintiffs sought to establish prima facie cases under federal and state law by producing evidence to support the allegations in their complaint. In recounting the evidence in the record on summary judgment, we keep in mind that the facts are to be considered in a light most favorable to the plaintiffs. Belec v. Hayssen Mfg. Co., 105 F.3d 406, 408 (8th Cir. 1997). Part of that record consists of testimony from five former employees of the Columbia store. They testified that Dillard's had discriminatory polices in respect to African American shoppers and that there was discriminatory enforcement of store policies on returns, exchanges, and shoplifting.

Tammy Benskin, a white employee in the men's fragrance department from 1997 to 1998, testified that Dillard's had an unwritten policy of closely surveilling and following black shoppers. According to Benskin the store's general security code – Code 44 – was customarily announced over the employee intercom whenever an African American came into the store. The code was almost never used when a white shopper entered. Store manager Don Edson and one of his assistants regularly followed African American shoppers closely, including frequent customers who had

made substantial purchases at Dillard's. Benskin said she never saw Edson watch or follow white customers. One African American customer who had spent a great deal of money in the store became so upset by being followed that he turned on Edson and yelled, "I do not have to take this. I am here to buy clothes." Benskin stated that she was told by Dillard's employees that African American customers "steal all the time." One of the reasons she quit was because she "couldn't deal with the prejudice anymore."

Kenneth Gregory is a police sergeant for the city of Columbia who worked part time at Dillard's as a security guard during the years 1995, 1997, and 1998. He also is the husband of Crystal Gregory. While he was working at Dillard's, the store announced a zero tolerance policy for shoplifters. That policy was to prosecute shoplifters "to the full extent of the law" with no exceptions. Security personnel were told to watch for anyone taking merchandise and to wait until the individual attempted to leave the store before making an arrest. Gregory contrasted the store's treatment of white shoplifters who were sometimes allowed to leave if they returned the stolen merchandise or paid for it with that of others who were arrested and prosecuted even though they offered to reimburse the store. On one occasion when Gregory was preparing to arrest a white shoplifter, store manager Edson intervened. Instead of following the zero tolerance policy, Edson asked the man if he had intended to pay for the merchandise. Gregory testified that on virtually every one of his shifts he saw African American shoppers being followed by Dillard's employees. He said he observed many instances where there was no other apparent reason for the surveillance than the race of the customers.

Former employees testified about discriminatory enforcement of the policy on returns. From March 2000, the Columbia store's policy on returns required customers to produce either a receipt of purchase *or* merchandise with an attached Proof of Purchase (POP) label showing it had been purchased at the Columbia store. Before that date the policy was that customers had to produce a receipt in order to return

merchandise, but evidence was produced that white customers were frequently allowed to return items without a receipt.

Maren Snell worked at Dillard's in 2001 in the women's fragrance department. A black woman herself, she is also one of the appellants. In discovery she testified that she frequently witnessed African Americans unsuccessfully attempt to return merchandise carrying POP labels. White customers were never asked to furnish receipts if they were returning merchandise carrying a POP label, but she often saw a supervisor named Tracy and other Dillard's employees refuse to accept such returns from blacks without original receipts. Tracy also told Snell not to give fragrance samples to a group of black girls in the store because "they're not going to buy anything anyway." Snell testified she herself was once followed when she went into the store off duty to shop. She frequently saw other African American shoppers being subjected to discriminatory treatment. On several occasions she was instructed by supervisors to go "watch those black kids" or to follow black shoppers.

Rick Beasley, an official with the Missouri Department of Economic Development, worked at Dillard's selling men's suits from 1996 until 1999. He observed systematic racial discrimination at Dillard's that he said was carried out by many employees. He also described seeing black customers treated differently from whites when trying to return a purchased item without a receipt. Theresa Cain worked at the Columbia store from 1999 to 2000. She reported that African American customers were "stereotyped" by Dillard's employees and that the security personnel were so focused on watching black customers that they frequently missed shoplifting offenses by whites.

The plaintiffs dismissed on summary judgment – Crystal Gregory, Alberta and Carla Turner, and Jefferson McKinney – were also deposed. Crystal Gregory, the wife of a Columbia police officer, testified that she could not remember a time at Dillard's when she was not followed by store employees. She also overheard sales people talking about how African Americans are likely to steal. Gregory was

particularly upset by her experience on February 3, 2001, when she and her sister went to Dillard's to purchase a "dressy" outfit. While they were attempting to look at the merchandise in the Ralph Lauren section, an employee named Tracy came up and began to follow after them. Gregory found a pair of pants she was interested in and entered a dressing room to try them on. When she came out to show her sister how the pants looked, she found Tracy standing directly outside of the dressing room "smirking" and flanked by two security guards. This conduct offended Gregory so much that she told her sister she was not going to buy the pants she had planned to purchase. She went up to the counter and asked to speak to a manager about the whole incident. The manager on duty, a woman named Janet, did not appear to care about her complaint so Gregory left the store. She returned the next morning to complain to store manager Don Edson about the incident. Edson said he was sorry and promised to talk with Tracy and the security guards.

Alberta Turner and her daughter Carla testified that they were almost always followed when they attempted to shop at Dillard's. Alberta complained that she was never offered assistance by the sales staff. The Turners' worst experience occurred on Memorial Day in 2002 when Alberta was shopping with Carla and her daughters. After they purchased some children's shoes, Carla and one of her daughters went to look for school clothes. They found several styles of pants they were interested in buying and went in a dressing room to try them on. When they came out, they faced both a sales associate and a security guard waiting outside the room. The sales associate stared at the bags of purchased merchandise Carla was carrying, and a security guard followed closely behind her and her child as Carla went to look for her mother. She asked the guard why he was following them. He gave her no answer and just continued to trail them. Alberta had in the meantime found merchandise she intended to purchase for her grandchildren, but she became upset when she saw the security guard trailing her daughter and grandchild. The family felt so humiliated they had to leave the store. On their way out, Alberta went up to a sales associate and told her that the store had just lost hundreds of dollars in sales. With a "weird grin" on her face, the associate responded, "So, so what?"

Jefferson McKinney is an occasional Dillard's customer. During the summer of 2000 he went to Dillard's with two of his cousins to shop for cologne. McKinney testified that he did not receive sales assistance as he waited at the cologne counter even though he made repeated eye contact with a sales associate. The associate nevertheless helped several white customers. While McKinney and his cousins waited, they began to sample the cologne testers set out on the counter. After approximately fifteen minutes, the associate came over and moved the testers without saying anything to the men. One of McKinney's cousins asked her why they weren't being waited on, and she responded with a "kind of rude . . . tone." The cousin asked her to call a manager. When she did not, they left the store.

Since the remaining appellants were dismissed on the pleadings, our analysis as to their claims must focus on the allegations of their complaint, see Fed. R. Civ. P. 12(b)(6), but the discovery evidence about their experiences is nevertheless part of the record on the motions for summary judgment. See Fed. R. Evid. 402, 404(b). Also in the record is the experience of Michael Butler, the nondismissed plaintiff who settled with Dillard's. Butler tried to return a pair of shoes he had purchased at Dillard's. Although the shoes had a POP label attached to them, two sales associates demanded a receipt from him and made accusatory remarks such as, "[You] could have stolen those shoes. People do that all the time and bring them in and try to get . . . money back." Butler offered to go home to get his receipt, but the salespeople demanded that he leave his shoes at the store and delayed him there for approximately one hour. Eventually he was permitted to leave the store with the shoes he had brought with him and subsequently returned with his receipt. He was then allowed to exchange the shoes for a new pair.

Almost all of the plaintiffs described being harassed or trailed by security guards or other employees while shopping at the Columbia Dillard's. Arnel Monroe and his daughter went to Dillard's to redeem a gift card she had received. Monroe described Dillard's as one of the only stores in the area that offered professional apparel. He testified that while they were shopping, he saw a Kenneth Cole shirt he

was interested in and carried it with him as the two walked toward the jeans section. Although Dillard's ordinarily permits its customers to carry merchandise with them from one department to another as they select various pieces, a security guard began to follow Monroe in a manner which alarmed his daughter who asked, "Daddy, why is that guy staring at us?" Monroe did not complete the purchase of a shirt he had selected to buy because the guard's conduct angered and humiliated him in front of his child. Michael Warrick testified that while shopping for jeans with his brother, a sales associate trailed them through more than one department. After Warrick selected and tried on a pair of jeans and was leaving the fitting room, the same sales associate "bumped" him in a deliberate manner apparently intended to dislodge concealed merchandise. This extraordinary behavior angered him and kept him from returning to Dillard's for four years even though he had been able to purchase the jeans from another employee.

When Treva Gage was shopping with her children and several friends, security guards followed them all over the store even when they went to the bathroom. Gage was upset and indignant at this behavior. She expressed amazement about this treatment to her friend who responded that Dillard's personnel "always do that . . . . I hate this place." Although Gage had selected several shirts to purchase, she felt so put down by the security guards that she laid the shirts on a sales counter next to a male employee and complained that she had been followed every time she came into Dillard's. He did not offer to help her, and she left the store.

Several of the plaintiffs testified that they had been denied service. When Michael Richmond was shopping for jewelry with his mother, he told a sales associated he wanted to look at a particular item in a closed display case. Instead of showing it to him, the sales associate repeatedly emphasized the price of the item and suggested he look for merchandise at the markdown counter. Richmond felt insulted and told her in a rude way that he was not interested in the markdowns. He left the jewelry department and complained to an assistant manager who apologized for what had occurred, and he left the store. Debra Hamilton testified to a specific incident

-8-

when she was shopping at Dillard's and was trailed by a security guard. After selecting a dress to purchase, she went to the sales counter to pay for it. She was ignored by the cashier who instead waited on a series of white customers who had arrived at the sales counter after Hamilton. Hamilton finally said to the sales associate, "Well, I thought I was here first." The only response she received was, "Well, I'm sorry." Hamilton left without the dress.

B.

In October 2003 Dillard's moved to dismiss the claims of Crystal Gregory and Alberta and Carla Turner for failure to state a claim or alternatively for summary judgment. After its motion was filed, Gregory and the Turners sought leave to amend their complaint to add the claims of other plaintiffs and to assert a class action. Leave to amend was granted, and Dillard's filed a second motion to dismiss directed at the new plaintiffs and opposed the motion for class certification. The latter motion was denied in April 2004, and in January 2005 the district court dismissed most of the § 1981 claims for failure to state a claim. Seven months later the district court granted summary judgment to Dillard's on the § 1981 claims of Gregory, Alberta and Carla Turner, and Jefferson McKinney as well as the MHRA claims of Gregory and the Turners. The district court denied summary judgment in respect to Michael Butler's § 1981 claim; the parties later settled his claim.

In analyzing the plaintiffs' § 1981 claims, the district court stated it was applying the test for a prima facie case of discrimination approved in Bediako v. Stein Mart, Inc, 354 F.3d 835, 839 (8th Cir. 2004), and Youngblood v. Hy-Vee Food Stores, Inc., 266 F.3d 851, 854 (8th Cir. 2001). To establish a prima facie case a plaintiff must show (1) membership in a protected class, (2) discriminatory intent on the part of the defendant, (3) engagement in a protected activity, and (4) interference with that

activity by the defendant.  <u>Bediako</u>, 354 F.3d at 839.[2]  It is not contested that appellants are members of a protected class.

In its order dismissing most of the plaintiffs' claims under Fed. R. Civ. P. 12(b)(6), the district court focused on the fourth factor in the prima facie test – actionable interference.  It required that a plaintiff plead "per se interference" with a protected activity in order to state a § 1981 claim.  The district court did not define the term but observed that plaintiffs had not alleged they had been "questioned, searched, detained, or subjected to physical activity other than being followed or subjected to surveillance."  In support of its per se interference test the court quoted a paragraph from <u>Garrett v. Tandy Corp.</u>, 295 F.3d 94, 101 (1st Cir. 2002), which rejected "unadorned" surveillance as a basis for § 1981 liability but only "[s]o long as watchfulness neither crosses the line into harassment nor impairs a shopper's ability to make and complete purchases."  <u>Id.</u>  Concluding that racially based surveillance was not per se interference with plaintiffs' ability to contract, the district court dismissed all claims alleged by Monroe, Richmond, Hamilton, Gage, Warrick, Wisham, Felicia Turner, Snell, Lee, Butler, Deidre Golphin, and Cecilia Young, except for the "check writing and returns/exchanges" claims of Butler, Golphin, and Young.[3]

In its summary judgment order the district court applied a similar analysis to the claims of Gregory and the Turners.  It concluded that all except one of their claims

---

[2]<u>Bediako</u> classified these components in three parts, combining the third and fourth factors listed above.  We discuss these factors separately in order to sharpen the focus of the analysis.

[3]The record reflects that Butler settled his claims and that Golphin voluntarily dismissed hers.  Summary judgment was later entered against Young who has withdrawn her appeal.

were based on discriminatory surveillance.[4]  The court stated that such a theory was not actionable, citing Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091, 1108 (10th Cir. 2001) ("[D]iscriminatory surveillance . . . on its own [is] not actionable under § 1981 . . . .").  The court further concluded that Jeff McKinney and Cecilia Young also failed to establish prima facie cases: McKinney had not attempted to purchase cologne and Young's check had been rejected by an outside company.  The several MHRA claims were also dismissed because of the court's conclusion that Dillard's is not a place of public accommodation under state law.

Appellants contend that the district court erred in dismissing their claims under § 1981 and the MHRA.  They argue that Gregory, the Turners, and McKinney produced sufficient evidence to withstand summary judgment and that the allegations by the other appellants of violations of § 1981 were sufficient to survive the motion to dismiss.  Appellants claim they were subjected to a "systemic race-based surveillance and denial of service scheme" and argue that the district court erred in its ruling that Dillard's is not a place of public accommodation under Missouri law.

Dillard's responds that the district court's holding with respect to the scope of the appellants' rights under § 1981 was correct.  Appellants have only alleged or shown a possible loss of prospective contract interests says Dillard's, not the loss of an actual contract interest. The summary judgment plaintiffs were never denied entry into Dillard's, prevented from moving within the store or questioned, detained, or asked to leave.  Dillard's also argues that the plaintiffs failed to show discriminatory intent and that the district court was correct in concluding that Dillard's is not a place of public accommodation under the MHRA.

---

[4]The district court recognized only one nonsurveillance claim in Gregory's evidence, involving the removal of a security tag on an item she had previously purchased.  This claim was dismissed on the ground that she was not at Dillard's to buy anything on the day the tag was removed and thus had no contractual interest.  Gregory has not addressed this incident on her appeal.

II.

A.

Section 1981(a) provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."  This language was originally enacted in 1866 and then reenacted as part of the Enforcement Act of 1870, ch. 114, 16 Stat. 140, which the Supreme Court has called a "legislative cousin[]" to the Fourteenth Amendment since it was passed to help enforce its protections against racial discrimination.  Gen. Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 389 (1982).

Congress responded to more restrictive interpretations of § 1981 by enacting the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (1991 Act). Included in the 1991 Act was a broad definition of the equal right to make and to enforce contracts.  Under § 1981(b), that right includes "the *making*, performance, modification, and termination *of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship*."  Id. (emphasis added).  The 1991 Act was explicitly intended to "provide adequate protection to victims of discrimination."  § 3(4), 105 Stat. at 1071; see also H.R. Rep. No. 102-40(II), at 2 (1991) ("By restoring the broad scope of Section 1981, Congress will ensure that all Americans may not be *harassed*, fired, or otherwise discriminated against in contracts because of their race." (emphasis added)).  The Supreme Court has since recognized that in light of the 1991 Act's addition of § 1981(b), "[the] prohibition against racial discrimination in the making and enforcement of contracts applies *to all phases and incidents of the contractual relationship*."  Rivers v. Roadway Express, Inc., 511 U.S. 298, 302 (1994) (emphasis added).

The Supreme Court has never addressed the applicability of § 1981 in the specific context of retail transactions, but even before the 1991 amendments it made

it clear that the statute reaches all types of private contracting and the process of contract formation. See Runyon v. McCrary, 427 U.S. 160, 168, 172 (1976) ("classic violation" of § 1981 when parents seeking "to enter into contractual relationships" for their children's education were rejected because of race); see also Johnson v. Ry. Express Agency, Inc., 421 U.S. 454 (1975) (private employment). The Court reached a similar conclusion in Tillman v. Wheaton-Haven Recreation Ass'n, 410 U.S. 431, 439-40 (1973), when it held that an African American woman who had been denied guest admittance to a private swimming pool might also have a claim under § 1981. See also Patterson v. McLean Credit Union, 491 U.S. 164, 176-77 (1989) (§ 1981 reached discrimination in contract formation during hiring process).

## B.

Although no § 1981 case arising in retail stores has yet reached the Supreme Court, many have come before the circuit courts which have developed standards for analyzing them. Section 1981 "does not provide a general cause of action for race discrimination," Youngblood, 266 F.3d at 855, but specifically protects the equal right "to make and enforce contracts" regardless of race. 42 U.S.C. § 1981(a). Congress passed the 1991 Act to ensure that § 1981 reach all "phases and incidents of the contractual relationship," Rivers, 511 U.S. at 302, and the statute extends "beyond the four corners" of a particular contract. Garrett, 295 F.3d at 100, quoted in Green, 483 F.3d at 538. Some courts have broadly defined protected activity as that which is "enumerated" in the statute itself. Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1235 (11th Cir. 2000); Bellows v. Amoco Oil Co., 118 F.3d 268, 274 (5th Cir. 1997); Morris v. Office Max, Inc., 89 F.3d 411, 413 (7th Cir. 1996); Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993).

Under Eighth Circuit precedent, appellants had the burden to plead and then show that Dillard's had discriminatory intent, that they were engaging in activity protected by § 1981, and that Dillard's interfered with that activity. Green v. Dillard's, Inc., 483 F.3d 533, 538 (8th Cir. 2007); Bediako, 354 F.3d at 839. Their membership

in a protected class is undisputed.  Section 1981 protects the right of black shoppers "to the same benefits and privileges of contractual relationships as white shoppers." Green, 438 F.3d at 539.

Under § 1981 circumstantial as well as direct evidence can establish a prima facie showing of race based discriminatory intent.  Kim v. Nash Finch Co., 123 F.3d 1046, 1059 (8th Cir. 1997).  Direct evidence of discriminatory intent will rarely be available, for "there will seldom be 'eyewitness' testimony" regarding a defendant's mental processes.  Id. (internal quotations omitted).  Evidence of systemic discriminatory practices can be highly relevant in establishing animus toward nonwhites.  White v. Honeywell, Inc., 141 F.3d 1270, 1276 (8th Cir. 1998); Hawkins v. Hennepin Technical Ctr., 900 F.2d 153, 155-56 (8th Cir. 1990).  Discriminatory intent may also be evidenced by racial insults, Green, 483 F.3d at 540, or evidence that a retailer has discriminatory policies and practices.  Cf. id.  Another way of showing discriminatory intent is by evidence that similarly situated white shoppers were treated differently than black shoppers.  See, e.g., Barfield v. Commerce Bank, N.A., 484 F.3d 1276, 1279 (10th Cir. 2007); Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir. 2001).

Plaintiffs must show that they had a protected contractual relationship or interest.  Daniels v. Dillard's, Inc., 373 F.3d 885, 887 (8th Cir. 2004), citing Bediako, 353 F.3d at 839; Youngblood, 266 F.3d at 854.  A contract interest is created by an "intent to purchase."  Green, 483 F.3d at 539.  Mere presence on a store's premises with no indication of a desire to contract is insufficient to show a contractual interest under § 1981.  See Hampton, 247 F.3d at 1104; see also Morris v. Dillard Dep't Stores, Inc., 277 F.3d 743, 752-53 (5th Cir. 2001); Office Max, 89 F.3d at 414.  The retailer's display of goods serves as an offer which a customer considers by taking the goods off the rack or shelves, Garrett, 295 F.3d at 100, and then accepts by completing a purchase transaction with the cashier.  See Green, 438 F.3d at 539.  The protections of § 1981 are "triggered once a customer has made 'some tangible attempt to contract' by selecting particular items" offered by the retailer.  Id. at 538-39, quoting Morris,

277 F.3d at 752. For a prima facie case plaintiffs must show that they "actively sought to enter into a contract with the retailer." Green, 483 F.3d at 538; see also Williams v. Staples, Inc., 372 F.3d 662, 667-68 (4th Cir. 2004); Christian v. Wal-Mart Stores, Inc., 252 F.3d 862, 872 (6th Cir. 2001).

It is instructive to examine the factual circumstances in which courts have decided whether African American shoppers had a sufficient contract interest to make out a prima facie § 1981 claim. The plaintiffs in Green selected a particular wristwatch locked in a display case and told a sales associate they wished to purchase it. See 483 F.3d at 538-39. The plaintiff in Christian "made herself available to enter into a contractual relationship" by selecting items and placing them in her cart as she shopped. See 252 F.3d at 874. The plaintiff in Williams whose out of state check was not accepted had made out a sufficient contract interest by presenting the check to pay for his purchase. 372 F.3d at 668. Although the plaintiff in Garrett had an interest in forming a contract while he was in the store shopping, 295 F.3d at 101, his contractual relationship with the retailer ended when his purchase was complete. Id. at 102; see also Youngblood, 266 F.3d at 854-55. The contracting process continues, however, when a shopper wants to purchase another item, see Green, 483 F.3d at 538-39, or retains some residual entitlement to another benefit resulting from her purchase. See Hampton, 247 F.3d at 1104-05 (purchase created additional contract interest in right to free perfume sample).

The final element plaintiffs must establish under § 1981 is actionable interference by the defendant with their contractual interest. Green, 483 F.3d at 538; Daniels, 373 F.3d at 887; Bediako, 354 F.3d at 839. They must produce evidence of conduct, policies, or practices which "a trier of fact could find as a whole thwarted their attempt to make and close a contract" with the defendant. Id. at 539. Our court

-15-

has recognized that "den[ying] a benefit of the contractual relationship" is actionable interference under § 1981. Youngblood, 266 F.3d at 854.[5]

Actual interference has been found in varying circumstances, for § 1981 claims "call for careful line-drawing, case by case." Garrett, 295 F.3d at 101. Hampton, for example, held that a security guard's "interruption" of the plaintiff's attempt to redeem a coupon was "an actual loss" of the plaintiff's contractual privilege even though the transaction had not been made impossible. 247 F.3d at 1106. Refusal to accept a check was considered actionable interference in Williams, 372 F.3d at 668, as were discriminatory accusations of shoplifting and being ejected from the premises in Christian. 252 F.3d at 874. Refusal to wait on black customers, interference with another salesperson's assistance, and racially offensive comments created genuine issues of fact as to actionable interference in Green. See 483 F.3d at 539. The deliberate provision of inferior service to black patrons has also been held to establish actionable interference. See Solomon v. Waffle House, Inc., 365 F. Supp. 2d 1312, 1324-25 (N.D. Ga. 2004); McCaleb v. Pizza Hut of Am., Inc., 28 F. Supp. 2d 1043, 1048 (N.D. Ill. 1998).

Although § 1981 does not guarantee "an enjoyable shopping experience," it does prohibit racially discriminatory actions which taken as a whole thwart a shopper from closing a contract for merchandise. Green, 483 F.3d at 539. Thus, when a plaintiff adduces evidence from which a trier of fact could reasonably find that a retailer prevented the shopper from purchasing merchandise or receiving services

---

[5]The dissent's proposal to import into the retail context the "severe and pervasive" test used in employment discrimination cases would be a drastic departure from the law of this circuit and others; it also overlooks significant differences between the settings. Discriminatory retail harassment thwarts the *formation* of a contract while discriminatory harassment on the job *alters the terms* of an already formed contract. The employment relationship is a continuing one affecting the work environment and the severe and pervasive test arose out of that setting.

offered to other customers, a prima facie claim of actionable interference has been made.  See Barfield, 484 F.3d at 1278 (citing cases).

C.

The claims of Crystal Gregory, Alberta and Carla Turner, and Jefferson McKinney were all dismissed on summary judgment.  We review the district court's decision to grant summary judgment de novo, Ihnen v. United States, 272 F.3d 577, 579 (8th Cir. 2001), viewing the evidence in the record in a light most favorable to the appellants as the nonmoving parties, Clark v. Kellogg Co., 205 F.3d 1079, 1082 (8th Cir. 2000).  This review must be especially careful in discrimination cases.  See Heaser v. Toro Co., 247 F.3d 826, 830 (8th Cir. 2001).

On their appeal these plaintiffs contend that the district court erred in granting summary judgment to Dillard's because they presented evidence that they were each subjected to a "race-based surveillance and denial of service scheme" which deprived them of their equal right to make and enforce contracts.  Dillard's argues that appellants failed to produce sufficient evidence that the conduct about which they complain was motivated by race or that it interfered with any contracting right of theirs.  Dillard's further asserts that appellants voluntarily left the store without pursuing purchases and that the testimony of its former employees should be discounted since they did not testify about the particular experiences of the appellants.

Although the ultimate issue is whether Dillard's intentionally discriminated against the individual appellants, it would be wrong to "conflate the prima facie case with the ultimate issue of discrimination."  Williams v. Ford Motor Co., 14 F.3d 1305, 1308 (8th Cir. 1994).  Direct evidence is not necessary to establish a prima facie case of discriminatory intent, Kim, 123 F.3d at 1059, and summary judgment is improper if plaintiffs have produced evidence "establish[ing] facts adequate to permit an inference of discrimination."  Williams, 14 F.3d at 1308.  Here, appellants have

-17-

produced evidence of systemic practices from which discriminatory intent can be inferred.

There is substantial circumstantial evidence that the experiences of these appellants were part of a wider set of discriminatory practices at Dillard's which targeted African Americans. The deposition evidence offered by appellants includes not only their own testimony but also that of former Dillard's employees, Michael Butler, and the group of plaintiffs dismissed under Rule 12(b)(6). In their depositions former employees testified that although Dillard's adopted formally nondiscriminatory policies, it had practices which treated African American shoppers differently than whites. Code 44 was announced over the intercom when they entered the store, they were routinely followed as they attempted to shop, and they were denied services commonly afforded to white customers such as free fragrance samples or the ability to return POP merchandise without a receipt. Cf. Lizardo, 270 F.3d at 101, 104 (minimal evidence that white plaintiffs treated more favorably). This evidence shows not just incivility on the part of Dillard's employees, but harassing conduct, close and continuous trailing of black customers even up to the bathroom, discriminatory practices in returns and exchanges, failure to wait on black customers, and disparate enforcement of the policy on suspected shoplifters.

When all of this evidence is taken in a light most favorable to these appellants, as it must be on review of summary judgment, Clark, 205 F.3d at 1082, it is sufficient to create an inference of discriminatory intent on the part of Dillard's. See Hampton, 247 F.3d at 1107 (general evidence of discriminatory surveillance and higher detention rates for African American shoppers was sufficient indirect proof of discriminatory intent); cf. Daniels, 373 F.3d at 887-88 (8th Cir. 2004) (no showing of discriminatory intent where check rejected due to computer error and discount complaint was unsupported).

Although Dillard's argues that appellants have shown at most a "possible . . . future contract opportunity," citing Office Max, 89 F.3d at 414-15, the evidence

-18-

presented by Gregory and the Turners is about specific items they intended to purchase but for the actions of Dillard's employees. In contrast to the Youngblood plaintiff, who left the store after completing his transaction, these appellants produced evidence that they departed only because they had been thwarted in attempting to make a purchase and close a contract. Plaintiffs are required only to show that the defendant thwarted their ability to contract, not that the defendant forcibly expelled them. See Green, 483 F.3d at 539; Hampton, 247 F.3d at 1106; McCaleb, 28 F. Supp. 2d at 1047. The fact that a frustrated shopper has voluntarily left a retailer's premises is not dispositive in itself, for the issue is what caused the shopper to leave. See Green, 483 F.3d at 539. If the individual can show the retailer denied services or thwarted the attempt to contract, a prima facie claim can be made regardless of whether the retailer ejected the shopper. See also Solomon, 365 F. Supp. 2d at 1324.

The record taken in a light most favorable to Gregory and the Turners shows that they had selected or otherwise expressed interest in specific merchandise they intended to buy. Gregory and the Turners testified about the merchandise they had selected to purchase and had in hand. They thus made a "'tangible attempt to contract'" with Dillard's, Green, 483 F.3d at 538, quoting Morris, 277 F.3d at 752, and have made a sufficient showing of a protected interest to withstand summary judgment on that issue.

The final element in the prima facie case is actionable interference by Dillard's. The district court's test for this element was whether there was a "per se interference" with a contract interest, but such a test has not been used in our circuit or elsewhere. Cf. Green, 483 F.3d at 539; Garrett, 295 F.3d at 101;[6] Youngblood, 266 F.3d at 854; Christian, 252 F.3d at 872; Hampton, 247 F.3d at 1106. The proper test is whether Dillard's thwarted the plaintiffs' attempts to contract – to purchase goods or obtain

[6]The paragraph quoted by the district court from Garrett distinguished "unadorned" surveillance from actionable surveillance which "crosses the line into harassment [or] impairs a shopper's ability to make and complete purchases." 295 F.3d at 101.

services offered to other customers.  Green, 483 F.3d 539.  The district court's interpretation of the statute was simply too narrow.  As the Fourth Circuit has pointed out, in enacting § 1981 "[t]he Reconstruction Congress wrote broadly," and "we [must] give[] effect to that breadth."  Denny, 456 F.3d at 437 (Wilkinson, J.).  We must also give effect to the expanded scope which Congress mandated when it passed § 1981(b) and swept all "phases and incidents" of contracting within the reach of the statute.  See Rivers, 511 U.S. at 302.

Actionable interference may occur in different ways as evidenced by the cases and provided by the statute itself.  Denying any "benefit of the contractual relationship" is actionable interference.  Youngblood, 266 F.3d at 854.  Harassment and racial slurs created a genuine issue of fact on interference in Green, 483 F.3d at 539; see also H.R. Rep. No. 102-40(II), at 2 (among the goals of 1991 amendments was prevention of race based harassment of persons attempting to contract), a refusal to take a check satisfied the interference element in Williams, 372 F.3d at 668, and interruption of the plaintiff's attempt to redeem a Dillard's coupon was actionable interference in Hampton.  247 F.3d at 1106.  Discriminatory treatment that gives "a clear message" that black customers are not welcome is actionable even though customers are not "expressly told" to leave the premises.  McCaleb, 28 F. Supp. 2d at 1047.

Crystal Gregory and her sister were followed by employee Tracy from the time they reached the Ralph Lauren section at Dillard's up to the fitting room where Crystal wanted to try on the merchandise she was interested in.  When she came out with the pants she had selected, Tracy was waiting with two security guards and a smirking expression on her face.  Gregory was so offended that she decided not to buy the pants she had intended to purchase.  When she went to the manager on duty to complain, she received no offer of assistance and left the store.  A trier of fact could find from this evidence that the reason Gregory departed was because her attempt to purchase the pants had been thwarted and interfered with by Dillard's employees, including a manager.

After Carla Turner and her daughter left their fitting rooms, they found a sales associate with a security guard standing right outside, apparently waiting for them. The security guard then closely followed them as they went to find Carla's mother. Carla asked the guard why he was following them but he gave no answer. When Alberta saw the guard trailing Carla and her grandchild, she became upset. The family felt so humiliated they had to leave the store, but first Alberta complained about their treatment to a sales associate. The only response of the Dillard's employee was to ask, "So, so what?" with a "weird grin" on her face and without attempting to help the Turners complete their transactions. A factfinder could reasonably determine that these actions were hostile enough to thwart Gregory and the Turners from completing a contract of sale.

Taking the record in the light most favorable to Gregory and the Turners, we conclude that they have raised genuine issues of fact about whether Dillard's interfered with or thwarted their attempts to contract. Gregory and the Turners have produced evidence to make a prima facie showing that discriminatory conduct prevented them from completing their retail transactions. They described not merely being watched, but being treated in a demeaning and humiliating fashion by Dillard's sales associates and uniformed security guards. From the corroborative evidence in deposition testimony by former employees and the other plaintiffs, it could reasonably be inferred that the experiences of Gregory and the Turners were not isolated incidents, but part of a larger pattern of race based harassment and denial of services at the Columbia Dillard's. Michael Richmond and Debra Hamilton testified for example that they were denied service, Michael Warrick described being deliberately "bumped" by Dillard's personnel, and Michael Butler was thwarted in trying to exchange shoes and detained while white customers were allowed to return items without a receipt.

Appellant McKinney was also dismissed on summary judgment. McKinney and his cousins had sampled cologne testers while waiting for sales assistance. Although McKinney believed he had previously made eye contact with the sales associate who subsequently moved the cologne testers, there is no evidence that

-21-

McKinney ever communicated a desire to make a purchase as opposed to testing samples, cf. Green, 483 F.3d at 538-39, spoke to the sales associate about any merchandise when she came to the counter where he and his cousins were standing, or had more than a "general interest" in the cologne. Office Max, 89 F.3d at 414. We conclude that McKinney did not make out a prima facie showing of interference with a protected contract interest and that the district court did not err in granting summary judgment to Dillard's on his claim. This part of the district court judgment should be affirmed.

Evidence of discriminatory policies or practices may give rise to an inference of intentional discrimination by a defendant. See Williams, 14 F.3d at 1308. Evidence of racially discriminatory intent on the part of employees in their interaction with customers may also lead to liability for retailers. See Green, 483 F.3d at 541 (possible negligence or recklessness in hiring, retaining, and training). Here, plaintiffs have produced evidence that Dillard's has a systemic practice of surveilling and following African American shoppers, that it prosecutes African American shoplifters more than white shoplifters, that it specifically instructs employees to follow African American shoppers and employs Code 44 to warn of their entry into the store, that it discriminates in giving fragrance samples and enforcing its policy on return of merchandise, and that it selectively withholds service from black customers.

Appellants have produced evidence to show discriminatory intent on the part of managers or supervisors and other evidence from which inference of discriminatory intent on the part of Dillard's may be drawn. Examples of this evidence include store manager Edson's intervention to prevent arrest of a white shoplifter contrary to the zero tolerance policy, a supervisor's instructions to watch "black kids" and not give fragrance samples to blacks, and routine announcement of Code 44 upon the entrance of an African American into the store. Former employee Tammy Benskin testified that managers closely surveilled blacks but never whites, was told that black customers "steal all the time," and quit her job partly because of the racial prejudice she witnessed. Rick Beasley, a state official who had worked at the Columbia

-22-

Dillard's, testified that racial discrimination there was systematic. This evidence is sufficient to create a genuine issue of fact on whether Dillard's had discriminatory security and customer service policies and whether the specific actions complained of by appellants resulted from these policies.

On the record before us we conclude that summary judgment should not have been granted to Dillard's on the § 1981 claims of Gregory and the Turners because they established prima facie cases of discriminatory intent and interference with protected activity. The judgment against them should be reversed and their § 1981 claims remanded for further proceedings, but the judgment against McKinney should be affirmed because he failed to establish a prima facie case.

D.

We turn next to the claims which were dismissed for failure to state a claim on which relief could be granted – the claims of Monroe, Richmond, Hamilton, Gage, Warrick, Wisham, Felicia Turner, Snell, and Lee. The grant of a motion to dismiss is reviewed de novo, Carter v. Arkansas, 392 F.3d 965, 968 (8th Cir. 2004), taking all facts alleged in the complaint to be true and construing the pleadings in the light most favorable to the plaintiffs. Particularly in civil rights actions the complaint should be liberally construed. Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir. 1995). Appellants argue that the district court applied an inappropriately narrow legal standard to the allegations in the complaint (per se interference), that their allegations were sufficient under the rules, and that their claims should not have been dismissed. Dillard's contends that the amended complaint is conclusory and failed to allege facts sufficient to show discriminatory intent or denial of a contract right.

The amended complaint alleges that Dillard's "frequently engages in intentionally racially discriminatory surveillance pursuant to a policy and practice of racial discrimination, heightened scrutiny of African-American customers, and racial profiling." These allegations are sufficient to satisfy the intent element of a prima

facie case under § 1981, and direct proof of discriminatory intent is not required. See Kim, 123 F.3d at 1059. The amended complaint alleges that each plaintiff "sought to make and enforce a contract for services ordinarily provided by Dillard's," and that the ability to make and close contracts was thwarted by the denial of services, such as "the privileges of making shopping purchases," which were provided to similarly situated white customers, or the provision of services "in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory," such as "intentionally racially discriminatory surveillance."

Great precision is not required of the pleadings. See Smith v. Ouachita Technical Coll., 337 F.3d 1079, 1080 (8th Cir. 2003). The allegations in the complaint need not track the precise wording of a § 1981 prima facie case because there is not "a rigid pleading requirement for discrimination cases." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) (Title VII case). The "simplified notice pleading standard" under Fed. R. Civ. P. 8(a) requires only a statement that "'give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" Id., quoting Conley v. Gibson, 355 U.S. 41, 47 (1957).

The amended complaint satisfies that notice requirement, for when its allegations are construed in the light most favorable to appellants, as they must be, Frey, 44 F.3d at 671, they show that appellants have alleged facts constituting the elements of a prima facie case under § 1981: that appellants are African Americans, that they shopped for and selected particular items of merchandise, that they attempted to obtain services offered to others, that as African Americans they were subject to race based surveillance, and that Dillard's failed to provide them equal services and thwarted their attempts to contract.

The factual allegations in the complaint are "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007). The complaint states how, when, and where they were discriminated against. The complaint alleges that after 1998 these

appellants were "followed and/or otherwise subjected to surveillance based upon their race" at the Columbia Dillard's store. A plaintiff alleging that a retailer followed and otherwise subjected him to surveillance based on his race may be able to prove facts entitling him to relief under § 1981. The law forbids discriminatory harassment, see Green, 483 F.3d at 539; Garrett, 295 F.3d at 101; see also H.R. Rep. No. 102-40(II), at 2, so long as the plaintiff has a contractual interest. See Hampton, 247 F.3d at 1118. Finally, the complaint's allegation of "a policy and practice of racial discrimination" is sufficient to give Dillard's notice that plaintiffs seek to hold Dillard's directly liable under § 1981. We conclude that the pleadings, while not particularly detailed, were nevertheless sufficient as a matter of law and that the claims should not have been dismissed under Rule 12(b)(6).

The issue on appeal for the Rule 12(b)(6) dismissals is only whether their complaint stated a claim upon which relief could be granted, see also Fed. R. Civ. P. 8(a), and we conclude that the pleadings did so. The claims should therefore be reinstated and remanded for further proceedings.

III.

Lastly we address the dismissal of the MHRA claims of Gregory and Alberta and Carla Turner on Dillard's motion for summary judgment. The district court concluded that the Missouri statute banning discrimination in public accommodations did not cover retail establishments like Dillard's. Gregory and the Turners protest that Dillard's fits within the MHRA's definition of public accommodation and that the district court erred in dismissing these claims. Dillard's responds that the district court correctly concluded that the MHRA does not apply to Dillard's because retail establishments are not one of the examples which follow the statute's definition of public accommodation.

The MHRA prohibits discrimination on the basis of race in "any place of public accommodation." Mo. Rev. Stat. § 213.065(2). Places of public accommodation are defined within the statute as:

> all places or *businesses offering or holding out to the general public, goods, services*, privileges, facilities, advantages or accommodations for the peace, comfort, health, welfare and safety of the general public or such public places providing food, shelter, recreation and amusement, *including, but not limited to*: . . . .

Id. § 213.010(15) (emphasis added). After this general definition, the legislature listed some examples of places covered by the law; retailers were not mentioned. Id. § 213.010(15)(a)-(f).

Noting that no Missouri court had decided whether the MHRA covers retail stores, the district court looked to the federal civil rights law on public accommodations for guidance. Since the wording of several of the examples in the MHRA, including places selling food for "consumption on the premises," was borrowed from Title II of the Civil Rights Act of 1964, the district court relied on cases such as Priddy v. Shopko Corp., 918 F. Supp. 358, 359 (D. Utah 1995) (holding that a retail establishment is not a place of public accommodation under Title II), to conclude that the MHRA does not cover retailers. Gregory and the Turners contend that this was misguided since the MHRA differs significantly from Title II.

The MHRA contains a broadly phrased definition of public accommodation and examples which are illustrative, rather than exclusive. In contrast, public accommodations under Title II are those which fit within five categories of covered establishments. Retailers do not fall within those categories. The listed categories are not just examples, for the federal statute applies only to them. Congress thus provided "a comprehensive list of establishments that qualify as a 'place of public accommodation,' and in so doing exclude[d] from its coverage those categories of establishments not listed." Denny, 456 F.3d at 431 (citation omitted).

-26-

The Missouri legislature approached the coverage issue from the opposite direction taken by Congress. The MHRA has a general definition of public accommodation followed by illustrative examples. It specifically provides that the term public accommodation is not limited to those examples. Although Missouri courts may look for guidance to similar federal civil rights statutes and case law in deciding cases of first impression under the MHRA, see Mo. Comm'n on Human Rights v. Red Dragon Rest., Inc., 991 S.W.2d 161, 168 (Mo. Ct. App. 1999), they also examine any differences between the statutes. See Wentz v. Indus. Automation, 847 S.W.2d 877, 879 (Mo. Ct. App. 1992), overruled on other grounds by State ex rel. Diehl v. O'Malley, 95 S.W.3d 82 (Mo. 2003). The Missouri Supreme Court has also pointed out that the MHRA extends its protections further than the Civil Rights Act of 1964. See Keeney v. Hereford Concrete Prods., Inc., 911 S.W.2d 622, 624-25 (Mo. 1995) (noting the broader language of another provision in the MHRA).

In addition to its very broad definition of public accommodations the MHRA contains a nonexhaustive list of examples. We conclude that because of the significant differences between the state and federal statutes, Title II cases are not controlling on the issue of whether Dillard's is a public accommodation.

Under the MHRA, public accommodations are "*all* places or businesses" offering "goods [and] services" for the general public's "peace, comfort, health, welfare and safety." It is not contested that Dillard's offers goods, services, and facilities for the benefit of the general public. The Missouri statutory language in the general definition of public accommodations easily encompasses retail stores such as Dillard's. The wording of the MHRA's definition of public accommodation is broader than the specific examples which follow it, and more entities would fit within the general definition than the listed examples. Reading the statute to include retail establishments is also consistent with Missouri precedent which emphasizes that a remedial statute should be interpreted liberally. See Red Dragon Rest., 991 S.W.2d at 167, quoting Hagan v. Dir. of Revenue, 968 S.W.2d 704, 706 (Mo. 1998).

-27-

Dillard's argues that interpreting the MHRA to cover retailers would convert the statutory examples of covered establishments into surplusage, but this argument ignores the introductory words "including, but not limited to." When a list is introduced with the term "including," it is generally interpreted as enumerating "illustrative application[s]," not as constituting an "all-embracing definition." Fed. Land Bank of St. Paul v. Bismarck Lumber Co., 314 U.S. 95, 100 (1941). It is rather Dillard's interpretation which would create surplusage in the statute, because it gives no effect to the language "including, but not limited to." See Hadlock v. Dir. of Revenue, 860 S.W.2d 335, 337 (Mo. 1993) ("[E]ach word, clause, sentence and section of a statute should be given meaning."). Dillard's interpretation also disregards and gives no effect to the Missouri statutory definition of public accommodations which uses language broad enough to cover Dillard's.

For these reasons we conclude that Dillard's is a place of public accommodation under Missouri law and that the MHRA claims of Gregory and the Turners should not have been dismissed for lack of coverage.

IV.

On this appeal the fundamental questions are whether or not the district court erred in granting summary judgment to Dillard's on four of the appellants' claims or erred in dismissing the remainder for failure to state a claim. The record has not been developed on the other affirmative defenses alleged by Dillard's in its answer, the district court did not have occasion to address them, and they are not before us at this point. We conclude here only that Gregory and the Turners have produced enough evidence to show prima facie cases, that McKinney did not, and that the pleadings of the other appellants were sufficient to state a claim.

The record in this case includes evidence from both former employees and frustrated shoppers about racially discriminatory policies and practices at Dillard's that thwarted appellants' attempts to contract. Appellants alleged and produced evidence

to show that Dillard's denied African American shoppers privileges and services enjoyed by other customers including the same ability to make purchases. In its Rule 12(b)(6) determination the district court failed to consider all of the allegations in the complaint including those incorporated by reference, and on summary judgment it failed to consider the full record with all of its corroborating evidence. That evidence includes testimony about harassing surveillance at Dillard's; instructions to employees to follow black shoppers; use of Code 44 to notify employees when blacks enter the store; discriminatory policies and practices in respect to merchandise returns, provision of fragrance samples, and prosecution of shoplifters; withholding of services; and discrimination by employees in managerial positions.

In sum, we affirm the judgment of the district court in favor of Dillard's on Jeff McKinney's claim, but we conclude that the district court erred in granting summary judgment on the § 1981 and MHRA claims of Crystal Gregory and Alberta and Carla Turner and in dismissing the other § 1981 claims under Fed. R. Civ. P. 12(b)(6). We therefore reverse the judgment on those claims and remand them for further proceedings not inconsistent with this opinion.

COLLOTON, Circuit Judge, concurring in part and dissenting in part.

The principal question presented on this appeal is whether alleged discriminatory surveillance by a retail merchant, in which members of a particular racial group are watched more closely than others while shopping, constitutes a violation of the rights guaranteed by 42 U.S.C. § 1981. The issue is not whether such conduct by a merchant is condemnable or unlawful under some other civil rights statute, but whether the district court properly applied the specific provisions of § 1981 to the record in this case. The majority opinion, in my view, deviates from the prevailing view of the federal courts that have applied § 1981 to the retail shopping environment. The district court, hewing to that body of precedent, concluded that the claims of the thirteen appellants in this case should be dismissed, while the claim of one plaintiff, who later settled with Dillard's, presented a genuine issue of fact for

trial.  Because I believe the district court's approach represents a better application of the statute and is more harmonious with the present state of the law, I respectfully dissent from that part of the majority's decision that reverses the judgment of the district court.

I.

Section 1981 provides that all persons shall have the same right "to make and enforce contracts."  The version of this statute enacted in 1874 did not apply to conduct, such as racial harassment, that occurred after the formation of a contract and did not interfere with the right to enforce established contract rights through legal process.  *Patterson v. McLean Credit Union*, 491 U.S. 164, 175-85 (1989).  In 1991, Congress amended the statute to broaden its scope by defining the phrase "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).  Since then, the courts of appeals have recognized that § 1981 prohibits racial harassment that affects the performance of a contract or the enjoyment of the benefits, privileges, terms, and conditions of a contractual relationship.  *See*, *e.g.*, *Elmahdi v. Marriott Hotel Services, Inc.*, 339 F.3d 645, 652 (8th Cir. 2003); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000); *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998).  It is also clear that § 1981 applies to  discrimination that "blocks the creation of a contractual relationship" that does not yet exist.  *Domino's Pizza v. McDonald*, 546 U.S. 470, 476 (2006).

The court accurately states the elements of a § 1981 claim as including (1) membership in a protected class, (2) discriminatory intent by the defendant, (3) engagement in protected activity, and (4) interference with that activity by the defendant. *See Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 839 (8th Cir. 2004). Before turning to the specific allegations and evidence in this case, the majority engages in a lengthy discussion of the applicable legal standards.  It is well to consider first,

therefore, the soundness of this analysis, particularly as it relates to the third and fourth elements.[7]

_____

[7]My analysis of the third and fourth elements makes it unnecessary to consider the second element of the plaintiffs' claims, but it is noteworthy that the majority opinion overstates the evidence presented to the district court on that point in several respects. For example:

- The majority emphasizes twice that Dillard's had adopted a "zero tolerance policy" for shoplifters, but that "white shoplifters . . . were sometimes allowed to leave if they returned stolen merchandise or paid for it." *Ante*, at 4, 23. In fact, the words "zero tolerance policy" appear nowhere in the testimony cited by the appellants. As for "white shoplifters," there is evidence in the record about *one* white person who was followed in the store by security officer Kenneth Gregory on suspicion that he intended to shoplift a hat, but was stopped and questioned by store manager Don Edson before he exited the store. (Appellants' App. at 141-42). Gregory said that he would have apprehended the man for shoplifting if he left the store premises with the hat. (*Id.* at 141). He testified that when several other "people" asked Gregory "not to be arrested" and "to reimburse the store," Edson directed that they be prosecuted to the full extent of the law. (*Id*. at 142). There is no evidence concerning the race of the "people" who were prosecuted or that any white person arrested by Gregory for shoplifting was not prosecuted to the full extent of the law. Gregory testified that he "concluded" that Edson would not have stopped a similarly-situated black person suspected of preparing to shoplift a hat, but he produced no evidence that Edson ever intentionally refrained from questioning a suspected black shoplifter under similar circumstances. (*Id.* at 143).

- The majority emphasizes twice that former employee Rick Beasley "observed 'systematic' racial discrimination at Dillard's that he said was carried out by many employees." *Ante*, at 5, 23. In fact, while Beasley intimated vaguely that "a number" of employees may have engaged in unspecified "discrimination," he named only two employees, saying "I wouldn't call them racists," but that "maybe they had tendencies to watch folks that should not [sic]." (Appellants' App. at 153). As for the assertion of "systematic" racial discrimination, Beasley gave this response when asked about a store manager: "Do I think he's letting it happen? Not personally. But because it's systematic, it happens. And if it's not brought to his attention with credible evidence, he can't do anything

The third element of the § 1981 claims in this case requires proof that the plaintiff was engaged in protected activity in the retail shopping environment. The majority ultimately concludes that a plaintiff must make a "tangible attempt to contract" and show that she "actively sought to enter into a contract with the retailer" to meet this element. *Ante*, at 15. These standards are consistent with the approach set forth in the law of our sister circuits, which has firmly required that a shopper in a retail establishment must show an attempt to purchase, involving a specific intent to purchase an item and a step toward completing that purchase, to state a claim under § 1981.

The 1991 amendments to § 1981 broadened the scope of the statute, but they retained the statute's focus on contract obligations. Indeed, Congress "positively reinforced that element by including in the new § 1981(b) reference to a '*contractual relationship*.'" *Domino's Pizza*, 546 U.S. at 477 (emphasis in original). A plaintiff, therefore, "must point to some contractual relationship in order to bring a claim." *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001).

---

about it." (*Id*. at 155). Beasley did not attribute any scheme or plan to Dillard's. His statement actually expresses the opposite thought. Beasley's point was that individual employees would "take their own personal views and do the things they wanted to do," (*id*. at 153), and unless this "systematic" [sic] activity of individual employees was brought to the attention of the store manager, "he can't do anything about it." (*Id*. at 155). Indeed, Beasley's view was that Dillard's should perform a study that compared the treatment of young Caucasian men with an "urban look" with that of young African-American men with an "urban look" to determine *whether* they would be treated differently by store employees. (*Id*. at 162).

- The majority says Maren Snell testified that she "frequently witnessed African Americans" unsuccessfully attempt to return merchandise carrying POP labels. *Ante*, at 5. Snell actually testified that there were "a few instances," and when pressed for details, she could identify only one. (Appellants' App. at 189-90).

The Tenth Circuit specifically refrained from adopting an expansive interpretation of § 1981 that would "protect[] customers from harassment upon entering a retail establishment." *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1118 (10th Cir. 2001). Stating that it could not "extend § 1981 beyond the contours of a contract," the court rejected the claim of a plaintiff who failed "to make or attempt to make a purchase" at a department store. *Id*. In reaching this conclusion, the Tenth Circuit found itself "aligned with all the courts that have addressed the issue" in requiring that "there must have been interference with a contract beyond the mere expectation of being treated without discrimination while shopping." *Id*. (citing *Wesley v. Don Stein Buick, Inc.*, 42 F. Supp. 2d 1192, 1201 (D. Kan. 1999); *Sterling v. Kazmierczak*, 983 F. Supp. 1186, 1192 (N.D. Ill. 1997); *Lewis v. J.C. Penny Co.*, 948 F. Supp. 367, 371-72 (D. Del. 1996)).

The Seventh Circuit likewise upheld the dismissal of a claim brought by two shoppers who were examining time stamps and discussing the advantages and disadvantages of three or four models when they were approached by police. *Morris v. Office Max, Inc.*, 89 F.3d 411, 414-15 (7th Cir. 1996). Because the shoppers failed to demonstrate that they would have attempted to purchase the merchandise, they failed to state a claim under § 1981. Interference with "prospective contractual relations," said the court, was insufficient, even though the incident in question "understandably may have discouraged them from patronizing the store." *Id*.; *see also Shawl v. Dillard's, Inc.*, 17 F. App'x 908, 912 (10th Cir. 2001) (unpublished) (holding that the plaintiff had "not shown an actual contract loss" because "[t]he only thing that prevented her from purchasing the sandals was that the salesperson had been rude to her and she believed that he would get a commission if she purchased the sandals at that time," so she "opted not to pursue the contract"). Decisions that have recognized a claim under § 1981, by contrast, involved completed purchases or specific attempts to purchase merchandise. *Green v. Dillard's, Inc.*, 483 F.3d 533, 538 (8th Cir. 2007) (holding that shopper satisfied third element by selecting a specific item in display case and communicating to sales clerk her desire to purchase that item); *Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427, 435 (4th Cir. 2006) (holding that plaintiffs

-33-

who had purchased and received a gift package entitling the recipient to a variety of salon services had demonstrated a contractual relationship); *Williams v. Staples, Inc.*, 372 F.3d 662, 668 (4th Cir. 2004) (holding that the plaintiff sought to enter a contractual relationship when he offered payment by check); *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 874 (6th Cir. 2001) (holding that a plaintiff who had selected merchandise for purchase by placing it in her cart, had the means to purchase, and would have purchased the merchandise had she not been asked to leave the store had shown a sufficient contractual relationship to bring a § 1981 claim).

A customer's act of taking goods from a sales rack or shelf in a retail establishment does not by itself create a contractual relationship. Courts have found a contractual relationship in that circumstance only where the customer takes possession of an item with the intent to purchase it and acts for the purpose of doing so. *Barker v. Allied Supermarket*, 596 P.2d 870, 871 (Okla. 1979); *Fender v. Colonial Stores, Inc.*, 225 S.E.2d 691, 693-94 (Ga. Ct. App. 1976); *Giant Food, Inc. v. Washington Coca-Cola Bottling Co.*, 332 A.2d 1, 8 (Md. 1975); *Gillespie v. Great Atl. & Pac. Tea Co.*, 187 S.E.2d 441, 444 (N.C. Ct. App. 1972). When a customer lifts an item from a shelf or rack for the purpose of examining it to decide whether to make a purchase, there is no contractual relationship with the seller, *McQuiston v. K-Mart Corp.*, 796 F.2d 1346, 1348 (11th Cir. 1986), and the customer has not "sought to enter" into a contractual relationship as required to state a claim under § 1981. *See Domino's Pizza*, 546 U.S. at 476 (quoting *Runyon v. McCrary*, 427 U.S. 160, 172 (1976)). An attempt to contract, not mere interest in an item, is required to satisfy the third element of § 1981.

The majority recites that a plaintiff may meet the fourth element of a § 1981 claim – interference with protected activity – by presenting evidence that the retailer "thwarted" the shopper's attempt to make a contract. *Ante*, at 16 (citing *Green*, 483 F.3d at 539). If properly applied, this formulation is consistent with the decisions of other circuits, and with the Supreme Court's explanation that § 1981 applies to

discrimination that "blocks" the creation of a contractual relationship. *Domino's Pizza*, 546 U.S. at 476.

It is well recognized, however, that not all conduct of a merchant that offends a customer is sufficient to constitute actionable interference with a contractual relationship for purposes of § 1981. The Fifth Circuit, for example, has held that where a shopper abandoned his purchase due to a merchant's mistreatment of the shopper's daughter, the merchant did not "actually interfere" with or "thwart" an attempted purchase in a manner that violated § 1981. *Arguello v. Conoco, Inc.*, 330 F.3d 355, 358-59 (5th Cir. 2003). In that circuit, "a § 1981 claim must allege that the plaintiff was *actually prevented, and not merely deterred*, from making a purchase or receiving a service after attempting to do so." *Id.* (emphasis in original) (internal quotations omitted); *accord Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 752 (5th Cir. 2001); *see Henderson v. Jewel Food Stores, Inc.*, No. 96 C 3666, 1996 WL 617165, at *3-4 (N.D. Ill. Oct. 23, 1996).

The Seventh Circuit similarly has held that where a shopper opts not to contract with a merchant because the shopper is offended by certain racially motivated activity of an employee of the store, there is no claim under § 1981. In *Bagley v. Ameritech Corp.*, 220 F.3d 518 (7th Cir. 2000), a customer left a store after he was offended by the behavior of an assistant sales manager, who said she "would not serve" the customer and "gave him the finger." *Id.* at 520. The court held that while it could not fault the customer for taking offense, this offensive conduct was insufficient to state a claim under § 1981, because the merchant was "not responsible for terminating the transaction." *Id.* at 522.

A primary shortcoming of the majority opinion, in my view, is that it fails to establish an appropriate objective standard for determining what conduct of a retail merchant is sufficient to "thwart" or "block" a shopper's attempt to purchase merchandise. For the most part, the court opts simply to call for "careful line-drawing, case by case," *ante*, at 16, without providing any standard by which to locate

that line in this case or future cases. The closest thing to a governing standard is the majority's suggestion that when a shopper chooses to abandon a purchase after an action of the merchant that is "demeaning and humiliating," *ante*, at 22, then the merchant has "thwarted" the transaction. To the extent this "demeaning and humiliating" test is the standard, however, it fails to distinguish the opinions of other circuits concluding that discriminatory surveillance or watchfulness is not actionable, *see Garrett v. Tandy Corp.*, 295 F.3d 94, 101 (1st Cir. 2002); *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1108 (10th Cir. 2001), or decisions holding that other demeaning or humiliating actions of a merchant do not constitute actionable interference under § 1981. *Arguello*, 330 F.3d at 358-59; *Bagley*, 220 F.3d at 522; *see also Morris v. Office Max, Inc.*, 89 F.3d at 415 (rejecting claim under 42 U.S.C. § 1982, which is "construed in tandem" with § 1981, where although store's summoning of police to investigate shoppers was "undoubtedly disconcerting and humiliating," and "understandably may have discouraged them from patronizing the store," no actions of the police or the store personnel "actually impaired or interfered with their right to make a purchase").

While I believe, therefore, that the majority's approach is more expansive than the statute will support, Dillard's position regarding the "interference" element is conversely too narrow. Dillard's takes the Fifth Circuit's language that a plaintiff must be "actually prevented, not merely deterred" from making a contract to an unreasonable extreme by asserting that racial harassment could never amount to a violation of § 1981 in the retail context, so long as the victimized customer eventually would be permitted to make a purchase. Suppose, for example, that a merchant established two checkout lines, one for African-American customers and one for white customers, but required African-American customers to wait in line for several hours before making a purchase, while white customers were serviced immediately. Or suppose that African-American customers were permitted to make purchases only after running a gauntlet of racial slurs and epithets, physical threats, and refusals of service by multiple store clerks. The rather implausible implication of Dillard's position is that these hypothetical shoppers, if they choose to forego an opportunity

to purchase on these conditions, are merely "deterred" from making a contract, and are thus not deprived of the "same right" to make contracts as is enjoyed by white citizens. At some point, racially motivated harassment effectively "blocks the creation of a contractual relationship," *Domino's Pizza*, 546 U.S. at 476, and gives rise to liability under § 1981. *See Green*, 483 F.3d at 539.

To define what level of racial harassment is sufficient to constitute interference with the right to make and enforce contracts under § 1981, I would turn to the body of law that already has developed in our court and other circuits concerning racial harassment and § 1981 in the employment context. In 1991, Congress expanded the scope of § 1981 to supersede the Supreme Court's decision in *Patterson*, which determined that racial harassment after the formation of a contract did not violate the previous version of § 1981. 491 U.S. at 175-85; *see* H.R. Rep. No. 102-40(I), at 89-93 (1991), *as reprinted in* 1991 U.S.C.C.A.N. 549, 627-631. After the 1991 amendments, it is clear that racial harassment may, in certain circumstances, deprive a minority citizen of the "same right" to make and enforce contracts as is enjoyed by white citizens.

We have held, however, that Congress did not legislate that *all* racial harassment will trigger liability under § 1981, even though it may be offensive and reprehensible, and even though it may burden or have a negative effect on the enjoyment of contractual rights. To interfere with the right to make and enforce contracts in the employment environment, racial harassment must be "severe or pervasive," *Reedy v. Quebecor Printing Eagle, Inc.*, 333 F.3d 906, 908 (8th Cir. 2003), as it "would be viewed objectively by a reasonable person" and "as it was actually viewed subjectively by the victim." *Elmahdi*, 339 F.3d at 652; *see Patterson*, 491 U.S. at 208 (Brennan, J., dissenting in part) ("The question . . . should be whether the acts constituting harassment were sufficiently severe or pervasive as effectively to belie any claim that the contract was entered into in a racially neutral manner."). Whether this "high threshold of actionable harm" is satisfied in the employment context depends on such factors as whether the environment is "permeated with

discriminatory intimidation, ridicule, and insult," whether the plaintiff has been subjected to a "steady barrage of opprobrious racial comment," and whether the harassment includes conduct that is physically threatening or humiliating, as opposed to an "offensive utterance." *Elmahdi*, 339 F.3d at 652-53. In the workplace setting, the severity and pervasiveness of alleged harassment is typically measured over a period of time, whereas harassment in a retail environment must sometimes be evaluated on a single occasion involving a single alleged contractual event, but the touchstone of "severe or pervasive" harassment need not be altered.

Although Congress in 1991 was advised that "most litigation under section 1981 is employment discrimination litigation," H.R. Rep. No. 102-40(I), at 90, the amended statute applies to "all phases and incidents of the contractual relationship." *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 302 (1994). Nothing in the text of the statute suggests that courts should deem certain harassment insufficient to interfere with the "enjoyment of all benefits, privileges, terms and conditions of the contractual relationship" in an employment context, but consider the same harassment sufficient to interfere with the "making" of a contract in the retail context, *cf. ante*, at 16 n.5, given that both situations are encompassed within the same statutory definition of "make and enforce contracts." 42 U.S.C. § 1981(b). There is no good reason to believe that Congress intended to make actionable a broader range of harassment in the retail shopping context – an area that was not even the focus of legislative attention in 1991 – than in the employment area, which was the driving concern behind the legislation. Indeed, the body of precedent that has developed in the federal courts concerning § 1981 in the retail context appropriately "reflects a concern that too broad a reading would produce countless lawsuits based on minor or imagined discourtesies inflicted on customers by retail employees." *Garrett*, 295 F.3d at 107 (Boudin, C.J., dissenting in part).

Accordingly, while I agree with the appellants that racial harassment in the retail shopping environment may result in liability under § 1981, and disagree with Dillard's apparently blanket position to the contrary, I believe that a plaintiff must

show that such conduct by a merchant rises to the level of severe or pervasive harassment to establish a violation of the statute. This standard is consistent with the leading decisions in the retail context, which hold that a shopper's voluntary decision to leave an establishment, in the face of conduct that is offensive but not objectively severe or pervasive harassment, does not show the requisite interference with contractual rights under § 1981. *E.g.*, *Arguello*, 330 F.3d at 358-59; *Bagley*, 220 F.3d at 521-22; *see also Morris*, 89 F.3d at 415. It also aligns with our court's decision in *Green*, which held that where a sales clerk "explicitly refused service" to two shoppers based on race, "treated them at all times with pronounced hostility," "discouraged her coworker from assisting them by questioning their ability to pay," directed "a most egregious racial slur" and "forceful racial insult" at the shoppers, and "actively hindered" the efforts of another sales clerk to serve the customers, the plaintiffs had shown conduct sufficiently severe to constitute actionable interference. 483 F.3d at 539.

## II.

Turning to the specific claims at issue in this appeal, the district court resolved nine of them on a motion to dismiss, holding that an allegation of discriminatory surveillance alone was insufficient to state a claim under § 1981. The complaint in this case involved seventeen plaintiffs, thirteen of whom have appealed. In the complaint, each plaintiff made a summary allegation, quoted by the majority, that he or she had been "deprived of services" while similarly situated white persons were not, or had received services "in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory." (Appellants' App. at 50-85). To explain the grounds on which their claims rested, plaintiffs Crystal Gregory, Alberta Turner, and Carla Turner included factual allegations concerning their shopping experiences at Dillard's, and alleged that employees of Dillard's had taken certain actions based on race in those instances that gave rise to liability under § 1981. In sharp contrast to Gregory and the Turners, the nine appellants considered on the

motion to dismiss alleged in their factual section of the complaint only that "each experienced . . . instances at Dillard's Columbia, Missouri store in which they were followed and/or otherwise subjected to surveillance based upon their race." (Appellants' App. at 50).

A civil rights complaint "must contain facts which state a claim as a matter of law and must not be conclusory." *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. 1995); *see also Nickens v. White*, 536 F.2d 802, 803 (8th Cir. 1976). While a plaintiff need not set forth "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007), or "specific facts" that describe the evidence to be presented, *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (per curiam), the complaint must include sufficient factual allegations to provide the grounds on which the claim rests. *Twombly*, 127 S. Ct. at 1965 n.3. A district court, therefore, is not required "to divine the litigant's intent and create claims that are not clearly raised," *Bediako*, 354 F.3d at 840, and it need not "conjure up unpled allegations" to save a complaint. *Rios v. City of Del Rio*, 444 F.3d 417, 421 (5th Cir. 2006) (internal quotation omitted).

In this case, the nine motion-to-dismiss appellants did spell out the factual basis for their claims. The grounds upon which their claims rest is an assertion that Dillard's caused them to be followed and surveilled while they were in the store. (Appellants' App. at 50). This factual allegation fails to state a claim. Absent an allegation that the plaintiffs attempted to purchase merchandise, the complaint fails to meet the foundational pleading requirements for a suit under § 1981, because it does not satisfy the third element that the plaintiffs attempted to make a contract. Protected activity under the statute does not extend to "the mere expectation of being treated without discrimination while shopping." *Hampton*, 247 F.3d 1118; *accord Garrett*, 295 F.3d at 101.

Nor does the complaint allege sufficient interference with asserted protected activity to state a claim under the fourth element. The First Circuit, observing that "[i]n a society in which shoplifting and vandalism are rife, merchants have a legitimate interest in observing customers' movement," held that an allegation of discriminatory surveillance is insufficient to state a claim under § 1981. *See Garrett*, 295 F.3d at 101. The Tenth Circuit reached the same conclusion, stating that "discriminatory surveillance" is "not actionable under § 1981." *Hampton*, 247 F.3d at 1108. Racially biased watchfulness, however reprehensible, does not amount to severe or pervasive harassment that is actionable. It does not "block" a shopper's attempt to contract. *See Domino's Pizza*, 546 U.S. at 476. It is evident to me that the district court's requirement of "per se interference" – used when discussing the claims of plaintiffs who had not alleged anything "other than being followed or subjected to surveillance," *ante*, at 10 – was simply another way of expressing the same conclusion. I thus agree with the district court that the reasoning of *Garrett* resolves these claims, and I would not reverse the district court for evaluating the complaint based on the factual allegations actually made by the plaintiffs.

The § 1981 claims of four other appellants were dismissed on a motion for summary judgment. The majority affirms with respect to one appellant, but reverses the judgment as to the other three. The district court properly applied the law to the applicable facts, and I would affirm the judgments on all of these claims as well.

Crystal Gregory presented evidence that a sales associate followed her as she selected a couple pairs of pants from a rack and took them to a fitting room at Dillard's. Gregory testified that when she came out of the fitting room, the sales associate had a "little smirk on her face," and that two officers were right outside the fitting room leaning on clothing racks. (Appellants' App. at 286). Gregory said she returned to the fitting room, removed the pants, and then took the pants to the counter, where the sales clerk was "getting ready to ring me up." (*Id*. at 287). At that point, Gregory told the sales clerk that she was not buying the pants.

The district court correctly concluded that this evidence does not establish interference with protected activity sufficient to prove a violation of § 1981. Evidence of surveillance or watchfulness on its own is insufficient to state a claim, *Garrett*, 295 F.3d at 101; *Hampton*, 247 F.3d at 1108, and the majority's effort to distinguish "merely being watched" from "being treated in a demeaning and humiliating fashion," *ante*, at 22, suggests a distinction without a difference on this record. In *Garrett*, three employees monitored the plaintiff throughout his visit to a store, and "at least one of them accompanied him throughout his visit." 295 F.3d at 96. Nonetheless, the *Garrett* court held that this active trailing of a minority shopper amounted to no more than an "unadorned" – and legally insufficient – claim that the plaintiff was carefully watched while on the premises. *Id*. at 101. The addition of a smirk on the face of a Dillard's sales clerk does not meaningfully distinguish this case from *Garrett*, *cf. ante*, at 21, particularly where Gregory admits that Dillard's did not refuse to contract, but rather that a sales clerk was "getting ready to ring [her] up" when Gregory herself declared that she would not make a purchase. As noted, several courts have held that conduct of a merchant that may be described as demeaning or humiliating does not amount to actionable interference with a contractual interest when a shopper abandons a purchase. *See Arguello*, 330 F.3d at 358-59 (holding no actionable interference where plaintiff voluntarily set product on counter and left without trying to buy it after sales clerk made racially derogatory remarks and mistreated plaintiff's daughter); *Bagley*, 220 F.3d at 520 (holding no actionable interference where plaintiff left store after customer was "offended" by sales clerk who refused to serve him, made obscene gesture, and previously stated that "I hate f***ing Mexicans"); *Morris v. Office Max, Inc.*, 89 F.3d at 415 (holding no actionable interference although store's conduct was "undoubtedly disconcerting and humiliating"); *see also Denny*, 456 F.3d at 435, 437 (recognizing that while "[t]he Reconstruction Congress wrote broadly," a plaintiff's "failure to advance a pending or current contractual relationship [has] proved fatal to a § 1981 claim," and distinguishing *Morris* on that basis) (Wilkinson, J.); *Garrett*, 295 F.3d at 102 ("We do not think that a customer can hold a merchant liable for denying the right to a refund that the customer never pursued").

In another apparent attempt to distinguish *Garrett*, the majority asserts that when Gregory "went to the manager on duty to complain, she received no offer of assistance and left the store," and concludes from these facts that a manager "thwarted and interfered with" Gregory's attempt to purchase a pair of pants. *Ante*, at 21. The *entirety* of evidence on this point is a snippet of Gregory's deposition testimony concerning what happened after Gregory told the sales clerk that she did not wish to purchase the pants: "And so I talked to the manager, and I believe her name was Janet. And she was not of much help, almost as if she did not care, and so I left and I left very upset." (Appellants' App. at 288). The evidence thus establishes only Gregory's subjective opinion that the manager was "not of much help." There is no evidence whatever concerning what Gregory asked the manager to do or what the manager offered to do. It is not a reasonable inference from this testimony that the manager blocked an attempt to purchase a pair of pants, when it is undisputed that Gregory *declined* a sales clerk's offer to ring up the sale. And even the majority's unduly generous reading hardly distinguishes *Garrett*. In that case, the customer's § 1981 claim was dismissed even though the store manager responded with "patently false" information when the customer called to complain about racially discriminatory treatment. *Garrett*, 295 F.3d at 97.

The claims of Alberta and Carla Turner were properly dismissed for similar reasons. The Turners presented evidence that after Alberta purchased several pairs of shoes at the Dillard's store, she, Carla, and Carla's children began to examine clothing in the children's department. Carla took her daughter to a fitting room, and when she exited the room, a sales associate and a security guard were outside looking at them. The security guard then followed Carla as she walked through the store to rejoin Alberta. Upset by the surveillance, Alberta took the clothing items to a sales counter, told the associate that she would not make a purchase, and told another clerk that "you just made someone lose a sale." (Appellee's App. at 170).

Again, the evidence presented by the Turners shows, at most, discriminatory surveillance and watchfulness, which is not actionable under § 1981. Moreover, as

with Ms. Gregory, Dillard's demonstrated its willingness to contract by selling shoes to Alberta Turner on the very same visit, but the Turners nonetheless abandoned their effort to purchase children's clothing. On this record, the district court properly dismissed the claims. *Garrett*, 295 F.3d at 101; *Arguello*, 330 F.3d at 358-59; *Bagley*, 220 F.3d at 521-22; *see also Morris*, 89 F.3d at 415.[8]

---

[8]To bolster its argument with "corroborative evidence" of an alleged "larger pattern of race based harassment and denial of services," the majority asserts that "Michael Richmond and Debra Hamilton testified . . . that they were denied service." *Ante*, at 22. The evidence does not support this broad characterization. Richmond testified that on one occasion, a salesperson turned and walked away from him when he attempted to check out, but that another salesperson offered to assist him before he left the store, and that he made other purchases at Dillard's earlier on the same day. (Appellants' App. at 230-34). Richmond said that on another occasion, a Dillard's salesperson tried to direct him away from expensive jewelry and toward bargain-priced jewelry. Richmond responded by saying, "I want to see this shit here," which led the sales clerk to say "[y]ou have no reason to be rude," and prompted Richmond's own mother to chastise him. He then left the department, complained to an assistant manager (who said she was "really sorry" that Richmond felt he was treated poorly), and left the store. (*Id*. at 221-22). Hamilton testified that she thought a salesperson once served a woman who arrived at a sales counter after Hamilton had arrived. Hamilton conceded, however, that the other customer did not confirm Hamilton's belief about who arrived first, and that after Hamilton said, "I thought I was here first," the salesperson said, "Well, I'm sorry." (*Id*. at 249). Hamilton testified that she then said, "Don't worry about it now" and "went ahead and left." (*Id*. at 248-49). Appellants cite no evidence concerning the race of the other shopper involved, and Hamilton made no assertion that the sales clerk refused to provide service after Hamilton said, "I thought I was here first."

\* \* \*

Our court has made clear that "[s]ection 1981 does not provide a general cause of action for race discrimination," *Youngblood*, 266 F.3d at 855, and other circuits have declined to recognize a § 1981 claim based on racially-motivated surveillance by a retail merchant. For the foregoing reasons, I would affirm the judgment of the district court dismissing the claims brought under § 1981.[9]

————————————————

————————————

[9]The majority proceeds to conclude that the district court also erred in dismissing with prejudice the appellants' claims under the Missouri Human Rights Act. These claims were before the district court based on supplemental jurisdiction under 28 U.S.C. § 1367(a). Whether the MHRA, through its definition of "place of public accommodation," extends to retail establishments is a novel question of state law. Because I conclude that the district court properly dismissed the federal claims, I would remand the case with directions to modify the final judgment so as to dismiss the claims under the MHRA *without* prejudice, so they may be decided by the courts of Missouri. *See Birchem v. Knights of Columbus*, 116 F.3d 310, 314-15 (8th Cir. 1997); *Ivy v. Kimbrough*, 115 F.3d 550, 552-53 (8th Cir. 1997) ("In most cases, when federal and state claims are joined and the federal claims are dismissed on a motion for summary judgment, the pendent state claims are dismissed without prejudice to avoid needless decisions of state law . . . as a matter of comity and to promote justice between the parties.") (internal quotation and citation omitted).